**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF MARYLAND,
   200 Saint Paul Place
   Baltimore, MD  21202

STATE OF NEW YORK,
   28 Liberty Street
   New York, NY  10005

STATE OF NEVADA,
   1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119

STATE OF COLORADO,
   1300 Broadway
   Denver, CO  80203

STATE OF ARIZONA,
   2005 North Central Avenue
   Phoenix, AZ  85004

PEOPLE OF THE STATE OF CALIFORNIA,
   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102

STATE OF CONNECTICUT,
   165 Capitol Avenue
   Hartford, CT  06106

STATE OF DELAWARE,
   820 North French Street
   Wilmington, DE  19801

DISTRICT OF COLUMBIA,
   400 6th Street NW
   Washington, DC  20001

STATE OF HAWAI‘I,
   425 Queen Street

Case No. 26-cv-1957

Honolulu, HI  96813

STATE OF ILLINOIS,
    115 South LaSalle Street
    Chicago, IL  60603

OFFICE OF THE GOVERNOR *ex rel. Andy Beshear, in his official capacity as Governor of the* COMMONWEALTH OF KENTUCKY,
    700 Capitol Avenue, Suite 106
    Frankfort, KY  40601

STATE OF MAINE,
    6 State House Station
    Augusta, ME  04333

COMMONWEALTH OF MASSACHUSETTS,
    1 Ashburton Place
    Boston, MA  02108

STATE OF MICHIGAN,
    525 West Ottawa Street
    Lansing, MI  48909

STATE OF MINNESOTA,
    445 Minnesota Street, Suite 600
    Saint Paul, MN  55101

STATE OF NEW JERSEY,
    25 Market Street
    Trenton, NJ  08625

STATE OF NEW MEXICO,
    408 Galisteo Street
    Santa Fe, NM  87501

STATE OF NORTH CAROLINA,
    P.O. Box 629
    Raleigh, NC 27602

STATE OF OREGON,
    100 Southwest Market Street
    Portland, OR  97201

JOSH SHAPIRO, *in his official capacity as Governor of* the COMMONWEALTH OF PENNSYLVANIA,
    30 North 3rd Street, Suite 200
    Harrisburg, PA  17101

STATE OF RHODE ISLAND,
    150 South Main Street
    Providence, RI  02903

STATE OF VERMONT,
    109 State Street
    Montpelier, VT  05609

COMMONWEALTH OF VIRGINIA,
    202 North Ninth Street
    Richmond, VA  23219

STATE OF WASHINGTON,
    800 Fifth Avenue, Suite 2000
    Seattle, WA  98104

STATE OF WISCONSIN,
    P.O. Box 7857
    Madison, WI  53707

        Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF EDUCATION,
    400 Maryland Ave SW
    Washington, DC  20202

LINDA McMAHON, *in her official capacity as United States Secretary of Education*,
    400 Maryland Ave SW
    Washington, DC  20202

        Defendants.

**INTRODUCTION**

1.      For decades, the federal student loan program has expanded access to graduate and professional degrees without regard to discipline.  By enabling more students to obtain post-baccalaureate degrees, the federal government has helped create a skilled workforce of well-paid professionals, with tremendous benefits for the Nation as a whole and Plaintiff States in particular.

2.      In July 2025, Congress passed the One Big Beautiful Bill Act ("H.R. 1"), which dramatically reduced the availability of federal student loans for graduate and professional students.  For the first time, H.R. 1 established different student loan limits for "graduate" and "professional" programs.  After July 1, 2026, "graduate students" will be permitted to borrow only up to $20,500 annually ($100,000 in aggregate); "professional students" will be permitted to borrow only up to $50,000 annually ($200,000 in aggregate).

3.      H.R. 1 distinguishes between "graduate students" and "professional students" by incorporating the definition contained in a federal regulation when H.R. 1 was enacted.  *See* 20 U.S.C. § 1087e(a)(4)(C)(ii).  Specifically, H.R. 1 provides that "the term 'professional student' means a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program."  *Id*; *see* U.S. Dep't of Educ., Final Rule, *Reimagining and Improving Student Education*, 91 Fed. Reg. 23,768, 23,789 (May 1, 2026) ("[T]he statute means what the regulation said on the date of enactment.").  That regulation defines "professional degree" as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required.  Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.),

1

Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

4.    Thus, after H.R. 1's provisions go into effect on July 1, 2026, whether a program of study meets 34 C.F.R. § 668.2's definition will determine whether students in that program may borrow up to the higher limit (for professional degrees) or lower limit (for graduate degrees).

5.    On May 1, 2026, the Department of Education ("Department") promulgated a new Final Rule (the "Final Rule" or "Rule"), effective July 1, 2026, which alters the definition of "professional degree" that Congress adopted.  The Final Rule narrows the definition incorporated into H.R. 1 and effectively makes the illustrative list of degrees exclusive, thereby excluding many healthcare and other professional degrees that would otherwise be eligible for the higher limits.

6.    Congress never intended anything of the sort.  The Rule's definition of "professional degree" directly contravenes H.R. 1 and is thus contrary to law in violation of the Administrative Procedure Act ("APA").  Congress spoke clearly:  A professional degree must meet three criteria—(1) "signif[ying] completion of the academic requirements for beginning practice in a given profession"; (2) signifying "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) "generally" enabling "professional licensure"—that were in the regulation Congress expressly incorporated into H.R. 1.  Congress did not require anything more or less.  But Defendants' Rule unlawfully adds criteria to that straightforward statutory definition and limits professional degrees to the illustrative list, contrary to the statute's plain terms.

7.    The Rule is also arbitrary and capricious in violation of the APA.  The Department arbitrarily relied on several factors Congress did not intend it to consider—such as whether professionals are subject to supervision and the "historical context" of the Department's regulation—and its application of those factors is inconsistent and contradictory.  The Department also failed to explain its rejection of an alternative definition during the negotiated rulemaking.

2

Finally, in promulgating the Final Rule, the Department failed to exercise its separate statutory authority to allow higher loan limits for certain high-cost degrees and failed to consider programs' operating costs, which is among the most important information relevant to that decision.

8.      Additionally, H.R. 1 provided that current students who borrowed federal student loans as of June 30, 2026, would be "grandfathered" into existing loan limits.  But with almost no explanation, the Final Rule excludes students from grandfathering if they transfer institutions or withdraw and re-enroll.  That is both contrary to the statute and arbitrary and capricious.

9.      The Court should declare the challenged portions of the Final Rule to be unlawful, vacate them, and enjoin Defendants from enforcing or implementing them.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704.

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiff State of Maryland and its Attorney General reside in this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within this district.

## PARTIES

*Plaintiffs*

12.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

13.     The State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States.  The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

3

14.    The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America.  The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

15.    The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado.  The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

16.    The State of Arizona, represented by and through its Attorney General, Kristin K. Mayes, is a sovereign state of the United States of America.  The Attorney General of Arizona is the State's chief law enforcement officer and is authorized to "[r]epresent this state in any action in a federal court[.]" Ariz. Rev. Stat. § 41-193(A)(3).

17.    The People of the State of California, represented by and through their Attorney General, Rob Bonta, bring this action on behalf of the sovereignty of the State of California.  Cal. Gov. Code § 100.  As the State's chief legal officer, the Attorney General is authorized to act on behalf of the People in this matter.

18.    The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

19.    The State of Delaware is a sovereign state of the United States of America.  This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941).

4

Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

20.    The District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb.  The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District.  D.C. Code. § 1-301.81.

21.    The State of Hawai'i, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America.  The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawai'i Revised Statutes § 28-1 to pursue this action.

22.    The State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America.  Attorney General Raoul is the chief legal officer for the State of Illinois and is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

23.    Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as the Governor of the Commonwealth of Kentucky.  The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81.  In fulfilling his constitutional duties, the Governor has authority to bring this action.

24. The State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

25. The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

26. The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

27. The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

28. The State of New Jersey is a sovereign State of the United States. New Jersey is represented by Attorney General Jennifer Davenport who is the chief legal officer of New Jersey.

29. The State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Raúl Torrez is the chief legal officer of the State of New Mexico and is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such action. N.M. Stat. Ann. § 8-5-2(B). Attorney General Torrez is also authorized to appear before federal courts to represent New Mexico when, in his judgment, the public interest of the state requires such

6

action. N.M. Stat. Ann. § 8-5-2(J).  This action is brought pursuant to Attorney General Torrez's statutory authority.

30.    The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

31.    The State of Oregon is a sovereign state of the United States.  Oregon is represented by Attorney General Dan Rayfield.  The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

32.    Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania.  The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed."  Pa. Const. art. IV, § 2.  The Governor oversees all executive agencies in Pennsylvania.

33.    The State of Rhode Island, represented by and through its Attorney General Peter Neronha, is a sovereign State of the United States of America.  As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

34.    The State of Vermont is a sovereign state of the United States. Vermont is represented by its Attorney General, Charity Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

35.    The Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law.  Va. Code § 2.2-500.  Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government.  *Id.* § 2.2-513.

7

36.    The State of Washington is a sovereign state in the United States of America. Washington is represented by and through its chief legal officer, Attorney General Nick Brown.

37.    The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul, who is the chief law enforcement officer of Wisconsin.

*Defendants*

38.    The United States Department of Education is a cabinet agency within the executive branch of the United States government.  20 U.S.C. § 3411.

39.    Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official.  She is charged with the supervision and management of all decisions and actions of that agency.  She is sued in her official capacity. *Id.* § 3412.

## LEGAL AND FACTUAL ALLEGATIONS

### I.    The William D. Ford Federal Direct Loan Program

40.    In 1993, under the Student Loan Reform Act of 1993, Pub. L. 103-66, Congress established the William D. Ford Direct Loan program ("Direct Loan Program"), a federal student loan program that makes loans available to undergraduate and graduate students under Title IV, Part D of the Higher Education Act of 1965 ("HEA").

41.    Congress established the Direct Loan Program to streamline the student loan system and achieve cost savings for students by removing private banks as the middlemen.  Previously, student loans were originated, serviced, and held by private banks and guaranteed by the federal government, which provided subsidies to lower interest rates and cover administrative costs.

42.    In 2010, under the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, Congress expanded the Direct Loan Program, offering Direct Subsidized and

Unsubsidized Loans to undergraduate students, Direct PLUS Loans and Direct Unsubsidized Loans to graduate and professional students, and Direct PLUS Loans to the parents of dependents.

43.     For Direct Subsidized Loans, which are available to undergraduate students with demonstrated financial need, the Department pays the interest on the loan while borrowers are in school at least half-time, for the first six months after graduation, and during a period of deferment. Direct Unsubsidized Loans are available on similar terms but the Department does not subsidize interest. Direct PLUS Loans supplement Direct Subsidized and Direct Unsubsidized Loans and allow graduate and professional students ("Graduate PLUS Loans") or parents of dependents ("Parent PLUS Loans") to borrow up to the cost of attendance.

44.     The Direct Loan Program provides numerous benefits. Because Direct Loans are not underwritten for credit risk and do not require a cosigner, they allow students who might struggle to obtain private loans to still access higher education. That ensures talent and dedication determine who can seek university degrees—not socioeconomic status. And because Direct Loans may have lower interest rates and qualify for loan forgiveness, they provide students more freedom to take lower-paying jobs in public interest or academia. Direct Loans also expand the pool of workers with in-demand skills (such as graduate-prepared nurses), helping alleviate shortages.

45.     For Plaintiff States, Direct Loans provide funding for students to attend public colleges and universities without the need to obtain a lender or cosigner. And because the federal government provides loans for program funds, public institutions are not at risk of losing tuition due to market conditions, providing a reliable source of capital that ensures eligible students are fully funded for an entire school year. Direct Loans also make graduate and professional programs more accessible at public institutions of higher education, and thereby enable Plaintiff States to increase enrollment and address their respective workforce needs.

46. 20 U.S.C. § 1087e sets forth the terms and conditions for federal student loans, which are determined, in part, by the academic level of the program in which a student is enrolled. Since 2012, both graduate and professional students have been limited to borrowing up to $20,500 annually ($138,500 in aggregate) in Direct Unsubsidized Loans. But students historically have been able to supplement their borrowing with Direct PLUS Loans up to the cost of attendance.

47. In July 2025, Congress passed H.R. 1, Pub. L. No. 119-21, which, among other things, eliminated Direct PLUS Loans and changed the loan caps for graduate and professional students. *Id.* § 81001, 139 Stat. 334–37, *codified at* 20 U.S.C. § 1087e. Under H.R. 1, graduate and professional students now face different fixed borrowing caps: graduate students may borrow up to $20,500 annually ($100,000 in aggregate), while "professional" students may borrow up to $50,000 annually ($200,000 in aggregate). 20 U.S.C. § 1087e(a)(4).

48. H.R. 1 also imposed a new "[l]ifetime aggregate maximum" for all federal student loans except for "a Federal Direct PLUS loan, or [other Federal PLUS loan], made to the student as a parent borrower on behalf of a dependent student." 20 U.S.C. § 1087e(a)(6). "[B]eginning on July 1, 2026, the maximum aggregate amount of loans made, insured, or guaranteed under this title that a student may borrow . . . shall be $257,500, without regard to any amounts repaid, forgiven, canceled, or otherwise discharged on any such loan." *Id.*

49. The statute contains a provision (the "Grandfathering Provision") that exempts from the new limits students who borrowed a federal loan and are "enrolled in a program of study at an institution of higher education" as of June 30, 2026, for the duration of their "expected time to credential" (up to a maximum of "three academic years"). 20 U.S.C. § 1087e(a)(8).

50. To distinguish between professional and graduate programs, Congress expressly adopted the definition of "professional degree" from 34 C.F.R. § 668.2 that existed at the time of

H.R. 1's enactment to determine which caps would apply to a loan. *See* 20 U.S.C. § 1087e(a)(4)(C)(ii) (defining "professional student" as "a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (*as in effect on the date of enactment* of this paragraph)" (emphasis added)).

51.    Under the operative version of 34 C.F.R. § 668.2 that existed when H.R. 1 was enacted and that Congress incorporated into the statute, a "professional degree" is:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree.  Professional licensure is also generally required.

52.    The regulation further provides a list of illustrative examples (emphasis added):

> *Examples* of a professional degree *include but are not limited* to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

53.    Prior to H.R. 1, the Department did not distinguish between graduate and professional students for the purpose of establishing student loan limits.  *See, e.g.*, 34 C.F.R. § 685.101 (2025) (permitting same Direct Loan borrowing for "graduate or professional student[s]"); *id.* § 685.203 (setting same loan limits for "graduate or professional student[s]").

54.    While the Department defined the term "professional degree" in 34 C.F.R. § 668.2, "[t]his definition served a very limited purpose in the Department's regulations."  *See* Dep't of Educ., Notice of Proposed Rulemaking, *Reimagining and Improving Student Education*, 91 Fed. Reg. 4254, 4262 (Jan. 30, 2026) (hereinafter "NPRM").  Indeed, the definition in 34 C.F.R. § 668.2 does not appear to be cited anywhere else in Title 34 of the Code of Federal Regulations.

55.     The Department first promulgated this definition of "professional degree" in 2007, opting to adopt the definition of "first-professional degree" used by the Integrated Postsecondary Education Data System (IPEDS).  NPRM, 91 Fed. Reg. at 4262–63.

56.     IPEDS is a series of annual surveys that gather data from all institutions that participate in federal student financial aid programs.  IPEDS is administered by the National Center for Education Statistics (NCES), a component of the Department's Institute of Education Sciences.

57.     IPEDS first defined the term "first-professional degree" in the 1950s to collect data on enrollment and degrees for students in "first-professional" fields.

58.     The Department has not changed the definition of "professional degree" since 2007.

## II.     Negotiated Rulemaking and Proposed Rule

59.     Following the passage of H.R. 1, the Department announced a negotiated rulemaking to, among other things, change the regulatory definition of "professional degree."  *See* Intent to Establish Negotiated Rulemaking Committees, 90 Fed. Reg. 35,261 (July 25, 2025). Negotiated rulemaking is a statutorily mandated process through which the Department must obtain the input of various constituencies in the content of a proposed student loan regulation.  20 U.S.C. § 1098a(b).  The Department held one negotiated rulemaking session from September 29 to October 3, 2025, and another from November 3 to November 7, 2025.  Negotiators represented various constituencies such as State officials and student loan collection agencies, as well as organizations representing taxpayers and the public interest (the Taxpayer Constituency).

60.     During the negotiated rulemaking, the Department first proposed a definition that would have limited a "professional degree" to the ten illustrative degrees in the statute and required the Secretary to designate other degrees through future rulemaking.  Over the course of the negotiations, the Department revised its proposal to additionally include clinical psychology

(Psy.D. or Ph.D.) and any programs that shared a four-digit Classification of Instructional Programs (CIP) code with one of the programs on the illustrative list (or clinical psychology).

61.    CIP codes are six-digit numbers—for example, 51.3801 (Registered Nursing / Registered Nurse)—that were developed by NCES to track and report programs in IPEDS.  The first two digits indicate a broad subject area, such as "51—Health Professions and Related Programs," and the first four digits indicate a subgrouping within that subject area, such as "51.38—Registered Nursing, Nursing Administration, Nursing Research and Clinical Nursing."

62.    On January 30, 2026, the Department of Education published a Notice of Proposed Rulemaking.  NPRM, 91 Fed. Reg. 4254.

63.    The NPRM's proposed definition of "professional degree" read (*id.* at 4332):

> (1) A professional degree is a degree that:
>     (i) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
>     (ii) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;
>     (iii) Generally requires professional licensure to begin practice; and
>     (iv) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the [fields listed in § 668.2, plus Clinical Psychology (Psy.D. or Ph.D.)].

64.    The NPRM also proposed to exclude any students who "withdr[ew] or otherwise cease[d] to be enrolled in the program of study" from its regulations implementing the Grandfathering Provision.  *E.g.*, *id.* at 4333.  The NPRM stated that grandfathering "is only available to borrowers who remain enrolled in a program of study as required by Section 81001 of [H.R. 1].  If a borrower withdraws, the borrower is no longer enrolled."  *Id.* at 4275.  "[T]he borrower would then be subject to the [new] loan limits . . . if the borrower were to re-enroll or matriculate at another institution."  *Id.*

13

65.     80,793 comments were submitted in response to the NPRM.  Approximately 97% of these comments were against the proposed rule and many voiced concern about the NPRM's exclusion of critical professions in healthcare and other fields.

66.     Commenters, including Plaintiff States, stated that the rule as proposed in the NPRM was unlawful, arbitrary and capricious, and harmful, and urged the Department to propose a definition of "professional degree" consistent with the statutory text adopted by Congress.

67.     In their comment, Plaintiff States asserted that the proposed rule was unlawful because it added several requirements to the definition of "professional degree" that were not in the statute, including that the degree be "generally at the doctoral level," *see* NPRM, 91 Fed. Reg. at 4332; that the degree "require[ ] at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework," *id.*; and that the degree fall within "a four-digit CIP code . . . in the same intermediate group as the fields listed in" the statutory list of examples or Clinical Psychology, *id.*.

68.     The NPRM also required that a professional not "be supervised by another professional" with "more education, training, and qualifications."  *Id.* at 4265.

69.     By adopting these non-statutory requirements, the NPRM excluded many healthcare and other professional degrees that met the statutory criteria.

70.     Plaintiff States also asserted the proposed rule was arbitrary and capricious.  The Department heavily relied on "its own historical practice" in defining "professional degrees," *id.* at 4265, as well as whether a worker was "supervised by another professional who has . . . more education, training, and qualifications," *id.*, neither of which Congress intended it to consider.

71.     The Department also failed to consider the evolution of academic requirements and practice authority.  The list of examples was taken from a regulation that had not been changed

since the 1950s, a time when graduate programs in nursing and other healthcare professions barely existed and law students still received L.L.Bs.  The Department also ignored changes in practice authority in the decades since, considering it "dispositive," for example, that "historically, licensed therapists did not require doctoral degrees," NPRM, 91 Fed. Reg. at 4266, even though a Doctorate in Physical Therapy has been the required entry-level degree in that field for ten years.

72.    The Department failed to explain why it rejected the Taxpayer Constituency's proposal, which would have added to the definition of 34 C.F.R. § 668.2 (*see id.* at 4315 n.46):

> The remaining professional degrees under this definition are those substantially similar to the examples [in the illustrative list] in both length and field of study, defined as a program of at least 80 credit hours and that is either classified within the same two-digit Classification of Instructional Programs (CIP) code of any of the degrees named above or as a degree in Clinical Psychology (Psy.D., etc.).

73.    Unlike the Department's proposal, the Taxpayer Constituency's definition both tracks the statutory language and captures health professionals such as nurse practitioners.

74.    The Department suggested that using two- rather than four-digit CIP codes (as the Taxpayer Constituency proposed) would increase loan disbursements, *id.* at 4315–16, but it did not address the Taxpayer Constituency's conclusion that its proposal could generate additional revenue for the government because health professionals are likely to repay their loans in full.

75.    Finally, the Department erroneously thought that H.R. 1 superseded the Secretary's authority under section 428H(d)(2)(A) of the HEA to increase loan limits for "specialized training requiring exceptionally high costs of education."  *Id.* at 4277 (quoting 20 U.S.C. § 1078-8(d)(2)(A)).  For decades, the Secretary has used that authority to "increase[ ] the aggregate loan limits for graduate and professional students enrolled in certain approved health profession programs," *see id.*, including physicians, healthcare administrators, and epidemiologists.

76.     H.R. 1 imposes general loan limits, but it does not expressly or impliedly preclude the Secretary from "determin[ing] that a higher amount is warranted" under her preexisting authority.  20 U.S.C. § 1078-8(d)(2)(A).  Because H.R. 1 does not irreconcilably conflict with section 428H(d)(2)(A) of the HEA, it did not impliedly repeal the earlier statute.

77.     Several commenters also objected to the Department's proposed limitations to the Grandfathering Provision, which would exclude in-progress students who transfer schools or withdraw and re-enroll in the same program.  They noted that the Department's proposed limitations were not supported by the statutory text.  They also emphasized that the proposed rule arbitrarily penalized certain students who continue to pursue the same program of study.

## III.    The Final Rule

78.     On May 1, 2026, the Department published the Final Rule that is the subject of this lawsuit.  Final Rule, 91 Fed. Reg. 23,768.

79.     The Final Rule will become effective on July 1, 2026 and made no changes to the NPRM's proposed definition of "professional degree."  *See id.* at 23,783-84.

80.     The Rule's preamble responds to some (but not all) objections that commenters raised to the proposed definition, especially regarding the exclusion of certain degrees.

81.     For example, with respect to Advanced Practice Registered Nurses (APRNs)—nurse practitioners, clinical nurse specialists, certified nurse midwives, and certified registered nurse anesthetists—the Final Rule acknowledges that they were members of "a fundamentally distinct profession" and "satisf[ied] the operative definition's three-part test."  *Id.* at 23,788–89.  The Rule also acknowledges that some graduate nursing programs fell within the same four-digit CIP code series (51.38) as degrees included within its definition.  *Id.* at 23,799.  Nevertheless, the Department declines to classify APRN degrees as "professional degrees" because, according to the Department, "they d[id] not satisfy the contextual requirements provided by the illustrative list of

16

advanced degrees included within the definition of *professional student*." *Id.* at 23,789. The Department explains that some APRN degrees were at the "master's-level" and could be obtained in fewer years than most (though not all) of the degrees on Congress's illustrative list, and that a minority of States require APRNs to be associated with a physician to practice. *Id.* at 23,796–97.

82. The Final Rule refuses to classify Doctorates in Physical Therapy and Occupational Therapy as "professional degrees" based on "a history of degree inflation." *Id.* at 23,793. The Department reasons that the entry-level degrees for physical therapists and occupational therapists formerly were master's degrees, and that classifying the current entry-level degrees as professional "could create a moral hazard to incentivize unnecessary degree inflation." *Id.*

83. The Final Rule "declines to include PA [physician assistant] programs as professional degree programs" because PAs "must generally be supervised by medical doctors." *Id*. at 23,800. "With just a few exceptions," the Department states, "States do not provide for independent practice authority for licensed physician assistants." *Id.*

84. With respect to speech-language pathologists (SLPs) and audiologists, "[t]he Department acknowledges that SLPs and audiologists meet the operative test." *Id.* at 23,807. The Final Rule nevertheless excludes those professionals because "advanced degree, licensure, and certification requirements for SLPs and audiologists are a recent development and therefore were not included in the original list of professional degrees" referenced by Congress. *Id.*

85. The Final Rule also "declines to use [the Secretary's] authority in [section] 428H(d) of the HEA," and declares that "the increased annual and aggregate loan limits established by the Secretary for graduate and professional students enrolled in certain approved health profession programs will not apply to loans made on or after July 1, 2026." *Id.* at 23,818.

17

86. Finally, the Department declines to make any changes to its regulations implementing the Grandfathering Provision. With respect to transfer students, the Final Rule states: "If a student transfers to a different institution, even in the same program of study, the Department would consider that to be a new program of study. Therefore, this student would not be eligible for the interim exception." *Id.* at 23,814.

87. The Final Rule reiterates that "[a] borrower who officially withdraws or otherwise ceases to be enrolled would lose continued eligibility under the interim exception." *Id.* at 23,813.

88. The Final Rule applies its limits to grandfathering for regulations that implement (1) the termination of Direct PLUS loans to graduate and professional students; (2) new annual and aggregate loan limits on Direct Loans for graduate and professional students; (3) new annual and aggregate loan limits for Parent PLUS borrowers; and (4) the lifetime maximum any student may borrow in federal student loans. 34 C.F.R. §§ 685.200(b)(3), 685.203(b)(2)(iv)(C), (e)(7), (f)(2)(iii), (g)(4), & (j)(4) (effective July 1, 2026); *see* Final Rule, 91 Fed. Reg. at 23,883–84.

## IV. The Final Rule's Definition of "Professional Degree" Is Contrary to Law and Arbitrary and Capricious

### A. The Final Rule's Definition of "Professional Degree" Is Contrary to Law and in Excess of Statutory Authority Because It Expressly Contradicts H.R. 1

89. The only criteria that H.R. 1 imposes for a program of study to be considered a professional degree (and subject to the higher borrowing cap) are that it (1) signifies "completion of the academic requirements for beginning practice in a given profession"; (2) signifies "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) "generally" requires "professional licensure." 34 C.F.R. § 668.2 (2025) (incorporated by 20 U.S.C. §1087e(a)(4)(C)(ii)). To illustrate degrees that would meet these criteria, Congress incorporated

by reference a non-exhaustive list of examples which stated that a professional degree "include[s] but [is] not limited to" these ten fields of study.  *Id.*

90.    The Final Rule adds criteria to the statutory definition of professional degree.

91.    First, the Final Rule's "professional degree" definition requires that the degree "[i]s generally at the doctoral level."  34 C.F.R. § 685.102(b) (effective July 1, 2026); *see* Final Rule, 91 Fed. Reg. at 23,882.  Second, it mandates that the degree "requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework."  *Id.*  Third, it specifies that licensure must be generally required "to begin practice" in the profession.  Fourth, the Final Rule also requires that the degree fall within "a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in [the illustrative example list and Clinical Psychology]."  *Id.*  Again, none of these requirements are in the statutory definition.

92.    The side-by-side comparison below shows these differences between the statutory definition of "professional degree" and the definition adopted in the Final Rule:

| Statutory Definition<br>34 C.F.R. § 668.2 (2025), *incorporated by* 20 U.S.C. §1087e(a)(4)(C)(ii) | Final Rule Definition<br>34 C.F.R. § 685.102(b) (effective July 1, 2026) |
|---|---|
| Professional degree: A degree that | (i) A professional degree is a degree that: |
| signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. | (A) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree; |
| | (B) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework; |
| Professional licensure is also generally required. | (C) Generally requires professional licensure to begin practice; and |
| | (D) Includes a four-digit program CIP code, as assigned by the institution or determined by the |

| | Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition. |
|---|---|
| Examples of a professional degree include but are not limited to | (ii) A professional degree may be awarded in the following fields: |
| Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.). | (A) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.). |

93.     The Final Rule's definition of "professional degree" thus straightforwardly contradicts the statutory definition of "professional degree."

94.     Indeed, the Rule *concedes* that many programs meet the three-part statutory test for a "professional degree" and yet are nonetheless excluded by the new regulatory definition.

95.     For example, the Department acknowledges that APRNs "satisfy the operative definition's three-part test." Final Rule, 91 Fed. Reg. at 23,788–89. Nevertheless, the Department concludes that these programs are not "professional degrees" under the Final Rule. *Id.* at 23,789.

96.     Likewise, the Department concedes that advanced degrees in athletic training, speech-language pathology, and audiology "meet the operative test"—that is, all three factors in the statutory definition of "professional degree"—but excludes them from the definition of "professional degrees" under the Final Rule. *Id.* at 23,805–07.

97.     According to the Department, a program must satisfy not only the statute's three criteria, but also "contextual principles" to qualify as a "professional degree." *See, e.g., id.* at 23,793 ("In applying [the statutory] definition, the Department looks to the structure of the three-part operative test, and the context supplied by the enumerated examples."); *id.* at 23,796 (a program that meets the statutory criteria must also "satisfy [a] contextual test").

98.     The Department claims to have derived these "contextual principles" from the illustrative list of professional programs referenced by the statute, which it asserts contain "clues" and "signs" regarding the statute's meaning. *Id.* at 23,784.

99.     In asserting that "contextual principles" must be met, the Department appears to be referring primarily, but not exclusively, to the four additional criteria in the Final Rule's "professional degree" definition that do not appear in the statutory definition. *See supra* ¶ 92.

100.     For example, the Department explains that a Master's of Science in Nursing (MSN) "appears to satisfy the three parts of the operative test" in the statute, but "fails to satisfy the contextual test" because, among other things, it is at the Master's level, contradicting the Final Rule's requirement that "a professional degree must generally be at the doctoral-level." Final Rule, 91 Fed. Reg. at 23,795–96 (emphasis omitted). But the statutory definition nowhere states that a professional degree must generally be at the doctoral level (or speaks to the level of the degree at all). And, as the Department admits, the list of illustrative programs in the statutory definition "contains . . . three non-doctoral degrees." *Id.* at 23,796.

101.     The Department also references "contextual requirements" that are nowhere to be found in the Final Rule's definition of "professional degree." For example, the Department states that Doctor of Nursing Practice programs "fail to satisfy the contextual test," because, among other things, nurses who graduate from these programs are subject to "career-long" supervision by individuals in other professions. *Id.* at 23,797. The Department gleans its lack-of-supervision requirement from "the contextual significance of the illustrative list." *Id.* at 23,787. According to the Department, for all of the degrees on the list incorporated by Congress, "people who practice these professions may obtain a license and practice without supervision of another licensed professional." *Id.* The Department therefore concludes that to be "substantially similar to the list

21

outlined in [34 C.F.R.] § 668.2," *id.*, an occupation cannot be "subject to career-long supervision or otherwise . . . required to [be] practice[d] under the supervision of (or in collaboration with) a licensed professional in a different profession." *See id.* at 23,796.

102.    As another example, the Department also concludes that Speech-Language Pathology and Audiology programs cannot be considered professional degrees because they "were not included in the original list of professional degrees." *Id.* at 23,807. Yet, the statute says nothing of these "contextual" requirements, and the Final Rule adds Clinical Psychology to the list of professions even though it was not among the examples incorporated into the statute.

103.    The Final Rule's "professional degree" definition is thus plainly contrary to law.

**B.  The Final Rule's Definition of "Professional Degree" Is Arbitrary and Capricious**

104.    The Department's Final Rule arbitrarily narrows the definition of "professional degrees" by relying on factors that Congress did not intend it to consider; applying those factors inconsistently; rejecting alternative definitions without explanation; and failing to properly exercise the Secretary's discretion to set higher loan limits for certain degrees.

**1.  The Department Relies on Factors Congress Did Not Intend It to Consider**

105.    The Department heavily relies on several factors that Congress did not include in the statutory definition of "professional degree." *See* 20 U.S.C. § 1087e(a)(4)(C)(ii) (incorporating 34 C.F.R. § 668.2 as of July 4, 2025). For one, the Department repeatedly considers whether an occupation "ordinarily must be supervised by a licensed professional in a different occupation and cannot be performed independently." Final Rule, 91 Fed. Reg. at 23,787. The Department uses that criterion to exclude several fields such as nursing that "satisfy the three parts of the operative test" from the definition of "professional degree." *Id.* at 23,795–96.

22

106. The Department's lack-of-supervision requirement is not in the statute, and the Department has pointed to nothing that suggests Congress intended it to consider this factor in defining "professional degree." The list of example degrees referenced by the statute is, by its terms, merely illustrative and cannot be used to exclude degrees that meet the statutory test. *See* 34 C.F.R. § 668.2 (2025), *incorporated by* 20 U.S.C. § 1087e(a)(4)(C)(ii)).

107. Another extraneous factor on which the Department heavily relies is the "historical context" of its regulation defining professional degrees. *See* Final Rule, 91 Fed. Reg. at 23,789. That, too, is not a factor Congress included in the statutory definition.

108. Because Congress incorporated the version of 34 C.F.R. § 668.2 "in effect on July 4, 2025," *see* 20 U.S.C. § 1087e(a)(4)(C)(ii)), previous versions are irrelevant.

109. Yet the Department refuses to categorize certain degrees as "professional" purely on the basis that the programs' "entry requirements changed over time." *See* Final Rule, 91 Fed. Reg. at 23,793. For physical therapists, for example, the Department deems it "dispositive" that "a lower-level degree at some point enabled the student to become credentialed, but now only a doctoral level degree can qualify an individual for licensure." *Id.* The Department opines that "recognizing this shift from the master's level credential to the doctoral level credential as a professional degree could create a moral hazard to incentivize unnecessary degree inflation." *Id.*

110. The Department cites nothing to suggest that Congress intended it to consider "degree inflation" as a factor in creating a regulatory definition of "professional degree."

111. Finally, the Department asserts that "a professional degree must generally be at the doctoral-level" and excludes certain professions from the definition of "professional degree" on that basis. *Id.* at 23,795–96 (emphasis omitted).

112. As the Department acknowledges, however, the list of illustrative programs referenced by the statute "contains . . . three non-doctoral degrees." *Id.* at 23,796. Congress thus cannot generally have intended to exclude master's degrees from the definition.

**2. The Department's Application of Its Factors Is Internally Inconsistent**

113. Not only has the Department added extraneous factors to the definition of "professional degree," it also applies those factors inconsistently and arbitrarily.

114. For example, the Department places great weight on whether occupations are "subject to career-long supervision or otherwise may be required to practice under the supervision of (or in collaboration with) a licensed professional in a different profession." *Id.* at 23,796. The Department uses that criterion to exclude APRNs from the definition of "professional degree," even though it acknowledges that APRNs "appear[ ] to satisfy the three parts of the operative test." *Id.* at 23,795–96. But the Department acknowledges that only a small minority of States require APRNs to have a relationship with a physician. *See id.* at 23,796.

115. The Department does not explain why restrictions imposed by a minority of States should be dispositive for a nationally applicable regulation. The Department states it would be "determinative" that "any State imposes any restrictions" because "an implied requirement of *professional degrees*" is that they "grant unrestricted ability for holders of those degrees to practice that profession in every State." *Id.* at 23,797. That suggests the Department thinks even *one* State imposing restrictions would preclude a degree from being "professional."

116. Elsewhere, however, the Department denies that "variation in State supervision and practice authority is relevant to determining whether a program may be considered a professional degree," and states that "a dynamic classification keyed to a certain numerical count of State laws . . . would undermine clarity, predictability, and nationally uniform administration." *Id.* at

24

23,787.  The Department does not explain how variation in State practice authority can be simultaneously "determinative" and irrelevant.  *Compare id.*, *with id.* at 23,796.

117.    Likewise, the Department's reliance on "historical context" fails to address decades of change in education and practice authority since the list of degrees was fashioned.

118.    The Department promulgated the definition of "professional degree" in 2007, adopting the definition of "first-professional degree" used by IPEDS.  NPRM, 91 Fed. Reg. at 4262–63.  The IPEDS definition and its list of degrees had not been changed since the 1950s.

119.    The Department thus has failed to consider the evolution of academic requirements and practice authority among different professions.  For physical therapists, the Department regards as "dispositive" that "historically, licensed therapists did not require doctoral degrees," *see id.* at 4266, even though for the past 10 years a Doctorate in Physical Therapy has been the required degree for all accredited entry-level physical therapist education programs.  *See* Final Rule, 91 Fed. Reg. at 23,793.  For nurse practitioners, the Department observes that "physician oversight is often required for APRNs to be allowed to practice," *id.* at 23,796, but discounts that well over half the States now "allow all NPs to evaluate patients, diagnose patients, order and interpret diagnostic tests, and initiate and manage treatments" without supervision by a physician.  *Id.*

### 3.    The Department Fails to Adequately Explain Its Rejection of Alternatives

120.    During the negotiated rulemaking, the Taxpayer Constituency proposed an alternative definition of "professional degree" that more closely tracked the statutory language in H.R. 1 and would have captured health professions such as physical therapists, nurse practitioners, occupational therapists, physician assistants, and audiologists.  The Department has failed to adequately explain why it rejected this proposal.

121. The Rule's implicit justification for rejecting the Taxpayer Constituency's proposal is that it "increase loan disbursements" by more than the Department's definition. *See id.* at 23,869.

122. The only evidence presented to the Department, however, indicated that the Taxpayer Constituency's proposal could generate additional revenue for the federal government because health professionals are likely to repay their loans in full.

123. The Department fails to explain why it focused on the increase in loan disbursements in the face of unrefuted evidence that the Taxpayer Constituency's definition was unlikely to lead to an economically significant increase in costs to the federal government.

### 4. The Department Has Failed to Properly Exercise the Secretary's Discretion to Set Higher Loan Limits for High-Cost Programs

124. The Final Rule also fails to exercise the Secretary's discretion to set higher loan limits for programs under section 428(d)(2)(A) of the HEA, 20 U.S.C. § 1078-8(d)(2)(A).

125. In the NPRM, the Department asserted that "[b]ecause the limits set forth in [H.R. 1] explicitly apply to all Federal Direct Unsubsidized Stafford Loans made to graduate and professional students . . . the increased annual and aggregate loan limits established by the Secretary for . . . certain approved health profession programs will not apply to loans made on or after July 1, 2026." NPRM, 91 Fed. Reg. at 4277.

126. Commenters, including Plaintiff States, pointed out that "the Secretary's authority to increase borrowing limits for these programs . . . was not amended in [H.R. 1]," and urged that "these limits should remain intact." *See* Final Rule, 91 Fed. Reg. at 23,818.

127. The Final Rule responds that "[d]ue to th[e] changes made by [H.R. 1], the Secretary declines to use her authority in [section] 428H(d) of the HEA to expand the list of programs or change the loan limits." *Id.* The Department has not explained why "changes made by [H.R. 1]" precluded the Secretary from increasing loan limits under section 428H(d).

26

128.    Apart from its incorrect suggestion that H.R. 1 had implicitly repealed section 428H(d), the Department has not "cogently explain[ed] why [the Secretary] ha[d] exercised [her] discretion" to eliminate higher loan limits for approved health profession programs. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

129.    Indeed, the Department explicitly did not consider "programs' cost" in determining "whether . . . programs [were] eligible for the higher loan limits" as "professional degrees."  Final Rule, 91 Fed. Reg. at 23,795.  But "high costs" are a factor that the Secretary is required to consider in exercising her discretion under section 428H(d).  20 U.S.C. § 1078-8(d)(2)(A).

130.    Many programs that the Department has refused to classify as "professional" entail high tuition because they are unavoidably costly to operate.  For example, the cost of nurse practitioners' clinical training alone—excluding classroom training, certification, and licensure fees—has been estimated to cost more than $47,000.  Those costs cannot easily be reduced because national standards mandate a faculty-to-student ratio of no more than 1:8 in clinical courses to ensure patient safety.  Likewise, the cost of PA graduates' clinical training has been estimated to exceed $45,000 per student.  When added to the expense of classroom instruction, these programs' operational costs can easily exceed the limits for non-professional graduate degrees.

131.    The Department did not consider such costs either in determining which programs qualified as "professional degrees," or in exercising the Secretary's discretion under 20 U.S.C. § 1078-8(d)(2)(A).  The failure to consider that issue was arbitrary and capricious.

132.    Notwithstanding that higher loan limits for health profession programs have been in effect since 1998, before eliminating those limits, the Secretary also did not "'provide a reasoned explanation for the change,' 'display awareness that [she was] changing position,'" or "consider

27

'serious reliance interests.'" *See FDA v. Wages & White Lion Inv'ts*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016)).

## V.    The Final Rule's Limits on H.R. 1's Grandfathering Provision Are Contrary to Law and Arbitrary and Capricious

133.    H.R. 1's changes to student loan borrowing do not apply immediately to students who borrowed a federal loan and are "enrolled in a program of study at an institution of higher education" as of June 30, 2026. 20 U.S.C. § 1087e(a)(8). Under the Grandfathering Provision, those students and their parents remain subject to preexisting borrowing limits for the duration of their "expected time to credential" (up to a maximum of "three academic years"). *Id.*

134.    The Final Rule limits the Grandfathering Provision with respect to withdrawals and transfers in a manner that is contrary to law and arbitrary and capricious.

### A.    The Final Rule's Limits on H.R. 1's Grandfathering Provision Are Contrary to Law and in Excess of Statutory Authority

135.    The Final Rule's limits on the Grandfathering Provision are contrary to law and in excess of statutory authority because they add requirements that do not appear in the statute.

136.    Each regulation implementing the Grandfathering Provision states the following with regard to withdrawals:  "If the student withdraws in accordance with [34 C.F.R.] § 668.22 or otherwise ceases to be enrolled in the program of study at any point after receiving the exception," then the student is no longer grandfathered and H.R. 1's new loan limits "shall apply." *E.g.*, 34 C.F.R. § 685.200(b)(3) (effective July 1, 2026); *see* Final Rule, 91 Fed. Reg. at 23,883.

137.    This requirement does not appear in the statute.

138.    H.R. 1 directs that its new loan limits "shall not apply" "during [a student's] expected time to credential" for any student who, "as of June 30, 2026," is (i) "enrolled in a

program of study at an institution of higher education," and (ii) "has received a loan . . . for such program of study." 20 U.S.C. § 1087e(a)(8)(A).

139.    For students to whom the loan limits "shall not apply," there are no additional criteria that would exclude students who subsequently withdraw and re-enroll.

140.    The NPRM asserted that "[i]f a borrower withdraws, the borrower is no longer enrolled. And the borrower would then be subject to the [new loan limits], if the borrower were to re-enroll or matriculate at another institution." NPRM, 91 Fed. Reg. at 4275.

141.    But the Grandfathering Provision requires only that the borrower "is enrolled in a program of study at an institution of higher education" "as of June 30, 2026" —*not* that the borrower be enrolled at an institution at all dates subsequent to June 30, 2026.

142.    The Final Rule is similarly deficient with respect to transfer students—that is, students who continue the same program of study at a different institution of higher education.

143.    The Preamble of the Final Rule states that "[i]f a student transfers to a different institution, even in the same program of study," then they are "not [ ] eligible for the interim exception," so H.R. 1's new loan limits apply. Final Rule, 91 Fed. Reg. at 23,814.

144.    As described above, however, the statute directs that H.R. 1's loan limits "shall not apply" "during [a student's] expected time to credential" for any student who meets the two statutory criteria. 20 U.S.C. § 1087e(a)(8)(A).

145.    Neither of those statutory criteria explicitly or implicitly requires a student to remain in the same institution of higher education.

146.    Because the Final Rule would exclude students from the Grandfathering Provision when the statute would not, this aspect of the Final Rule is contrary to law.

**B. The Final Rule's Limits on H.R. 1's Grandfathering Provision Are Arbitrary and Capricious**

147.    The Final Rule's limits on the Grandfathering Provision also are arbitrary and capricious because they lack a reasoned basis.

148.    The NPRM simply asserted, without explanation, that "[t]he grandfathering provisions do not apply to any student who withdraws, even if they subsequently reenroll in the same program." NPRM, 91 Fed. Reg. at 4267.

149.    Commenters "expressed concern that if [students] withdraw from their program . . . , they will lose the ability to borrow under the legacy limits under the interim exception, even if they subsequently return," including for students who "must take time off for personal reasons." *See* Final Rule, 91 Fed. Reg. at 23,813.

150.    In response, the Final Rule repeats the assertion that "[a] borrower who officially withdraws or otherwise ceases to be enrolled would lose continued eligibility under the interim exception." *Id.*  The Department offers no explanation *why* that should be the case.  There is no reasoned basis for doing so.  And the Department fails to consider the significant harm that would result to students and schools from this restriction.

151.    As for transfer students, the Department's treatment of them contradicts its treatment of students who shift among programs at a single institution.

152.    H.R. 1's exemption from the new loan limits applies throughout a student's "expected time to credential"—up to a maximum of three academic years—which in turn is defined by reference to a student's "program of study." 20 U.S.C. § 1087e(a)(8)(A).

153.    Neither H.R. 1 nor the Final Rule define the term "program of study."  For Parent PLUS loans for undergraduate students, the Final Rule states that "a student who changes majors within the same degree or certificate shall be considered to be enrolled in the same program of

30

study." 34 C.F.R. § 685.203(f)(2)(iv), 685.203(g)(5) (effective July 1, 2026); *see* Final Rule, 91 Fed. Reg. at 23,884. For graduate and professional students, the Preamble to the Final Rule states that "students who shift within the same 4-digit CIP code at a particular credential level at an institution" should be considered enrolled in the same program of study. *Id.* at 23,814.

154. But the Preamble to the Final Rule also asserts that "[i]f a student transfers to a different institution, even in the same program of study, the Department would consider that to be a new program of study" and "this student would not be eligible for" the exception. *See id.*

155. The Department does not explain why students who transfer schools but remain "in the same program of study" should not be covered by the Grandfathering Provision, even though students who "shift" programs within a school would be. *See* Final Rule, 91 Fed. Reg. at 23,814.

156. The Department also does not explain why it would "consider" transfer students to be enrolled in "a new program of study," even though it concedes such students may be "in the same program of study" at a new institution (thus satisfying the first requirement of the Grandfathering Provision, 20 U.S.C. § 1087e(a)(8)(A)(i)). *See* Final Rule, 91 Fed. Reg. at 23,814.

157. With respect to associate's degrees, the Preamble to the NPRM stated that the Grandfathering Provision would not cover a student who transfers from an associate's degree program into a bachelor's degree program, "even if the student remains at the same institution or even in the same program." NPRM, 91 Fed. Reg. at 4270.

158. In response to comments that "emphasize[d] that many students intentionally begin at two-year institutions with the expectation of continuing their degree program at a four-year school," the Final Rule claims that "Congress envisioned these transfer programs as functionally separate eligible programs." Final Rule, 91 Fed. Reg. at 23,821–22. Again, the Department does

31

not explain why it construes "the same program" to mean "a new program of study" for purposes of the Grandfathering Provision. *Compare id. with* NPRM, 91 Fed. Reg. at 4270.

159.   The Final Rule conflicts with other regulations and the Department's past practice, which treat students as enrolled in the same "program of study" even when they transfer schools.

160.   In determining whether students whose schools closed can discharge their loans, for example, the Department considers whether the students did or "did not complete the program of study at" their own school *or* "at another school." 34 C.F.R. § 685.214(d)(1)(i)(B).

161.   The Department also has failed to consider the harms that would result from its limitations on the Grandfathering Provision. The Grandfathering Provision was intended to protect the reliance interests of students who already expended time and money toward their degree. By narrowing that provision, the Final Rule undermines H.R. 1's intended protections and—as commenters asserted—risks "significant financial disruption to many students' lives." *See* Final Rule, 91 Fed. Reg. at 23,814. Yet the Final Rule does not address those impacts at all. *See id.*

## VI.   The Final Rule Will Harm Plaintiff States and Their Residents

162.   The Final Rule's unlawful definition of "professional degree" will harm Plaintiff States by reducing funding for many State institutions of higher education and impeding the States' abilities to meet critical workforce needs and provide services to their residents.

163.   First, the Final Rule will financially harm Plaintiff States' public universities and colleges, which operate many of the programs at issue. Indeed, the Final Rule acknowledges that its changes "create indirect costs for institutions." Final Rule, 91 Fed. Reg. at 23,856.

164.   The Final Rule explains (*id.*):

> Institutions of higher education will receive less loan revenue from the Federal government if those loans are used to cover education expenses paid directly to the institution, such as tuition and fees. While that revenue may be replaced by students securing other sources of financing or using more

of their own funds to pay for postsecondary education, some of it may not be replaced. This will cause a loss of revenue for institutions.

165. For example, each Plaintiff State operates an institution that offers degree programs in nursing. The University of Maryland School of Nursing offers an entry-level Master's of Science in Nursing degree that the Final Rule improperly refuses to classify as "professional."

166. In-State tuition and fees for the University of Maryland's entry-level MSN degree total $77,155 per year. Under the Final Rule, a student enrolled in that program could only borrow up to $20,500 per year in federal student loans, $29,500 less than if the degree were correctly classified as professional. The university will suffer "a loss of revenue" if—as the Department concedes is likely—not all students can obtain private loans to cover the gap. *Id.*

167. The Department also speculates that the Rule may force universities to "reduc[e] tuition prices," *id.*, which would further reduce public institutions' revenue.

168. By limiting loans for certain advanced degrees, the Rule will discourage students from pursuing those degrees and thereby reduce the supply of potential educators. Graduate degrees are usually a prerequisite for instructing future professionals. Moreover, accreditation standards and State rules limit the number of students that a faculty member may instruct. For example, Maryland requires a faculty-student ratio of 1:8 for clinical nursing courses, COMAR 10.39.02.06, and Nevada requires a ratio of 1:12, Nev. Admin. Code § 632.675(5).

169. The reduction in the number of graduate degrees conferred will predictably reduce the number of available faculty, which will likely force universities to reduce admissions into impacted programs. That would further reduce the tuition Plaintiffs' institutions receive.

170. Second, the Final Rule threatens Plaintiff States' ability to meet critical workforce needs, especially in healthcare, and impedes them from providing services to their residents through State institutions and State-funded providers.

33

171.   As the Final Rule recognizes, with the reduction in loan limits, "borrowers may have to reduce their enrollment due to the inability to afford the cost of their program." Final Rule, 91 Fed. Reg. at 23,856. Borrowers who cannot "afford their program through alternative means" "may have to drop out of their program" entirely. *Id.* The lower loan limits for APRNs, PAs, and other wrongly excluded professionals will likely reduce the supply of those graduates.

172.   Further, the reduced loan limits will likely cause students to graduate with more debt, discouraging them from finding less remunerative jobs in rural areas or the classroom.

173.   As discussed above, the Final Rule's effects on faculty recruiting will also likely reduce the number of students who can be instructed in both undergraduate and graduate programs, thereby reducing the number of students obtaining degrees in these programs.

174.   Although the Department speculates that universities could "reduc[e] tuition prices or restructur[e] their programs," *id.* at 23,856, the cost of attendance for many programs cannot be brought below the loan caps without compromising the quality of instruction or running afoul of accreditation standards. Healthcare programs are particularly expensive due to low student-teacher ratios, sophisticated simulation equipment that allows students to "fail safely," and high faculty salaries that must compete with private-sector employment.

175.   As a result, if the restrictive definition of "professional degree" is maintained, then many students will face the prospect of exceeding the federal-loan caps. Some of those students will be unable to obtain private loans; others will determine that the higher costs of private loans outweigh the benefits of a graduate degree and decline to enroll altogether.

176.   The result will almost certainly be fewer graduates joining the excluded professions each year and shortages for Plaintiff States' residents, especially in rural and impoverished areas.

177.    These shortages will predictably drive up costs for the States as employers.  For example, by reducing the supply of nurses, PAs, and other health professionals, the Final Rule will likely force States to pay higher salaries to avoid losing their employees to competitors.  That will likely increase personnel costs for State-funded hospitals, clinics, and correctional systems.

178.    Along with an overall reduction in graduates in the affected programs, the Final Rule will distort the employment choices for students who are able to take private loans to supplement their capped federal loans.  Because private loans are more expensive, there will be greater financial pressure on graduates to take higher-paying jobs in the private sector and in cities. That will redound to the detriment of Plaintiff States' residents who rely on State-provided services and Medicaid, especially in rural areas; it will likewise harm Plaintiff States' public universities because they cannot pay potential faculty members as much as private-sector employers.

179.    Those impacts also will undermine State laws and policies intended to increase the supply of in-demand professionals.  For example, Maryland and other Plaintiff States fund loan repayment assistance programs for nurses and other healthcare professionals who work for nonprofits or in high-need areas.  Those programs will be less effective at incentivizing students who are burdened with higher-cost private loans as a result of the Final Rule.

180.    In addition, the Department's unlawful narrowing of the Grandfathering Provision will harm Plaintiff States.  By subjecting students to the new loan caps who should be exempted, the limits on the Grandfathering Provision will reduce the amount of federal financial aid provided to State institutions of higher education, reducing those institutions' revenue.  And the Final Rule will force some students who should be exempted from the limits to withdraw if they cannot find substitutes for federal student loans, further reducing revenue.

181. Both the definition of "professional degree" and the limits on grandfathering will create administrative challenges for Plaintiff States' institutions. As the Department admits, "institutions are likely to incur costs determining their best response to these changes." *Id.*

182. Plaintiff States' institutions will expend resources counseling students regarding their eligibility for loans, especially if they are considering withdrawing or transferring.

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act —
### Contrary to Law and in Excess of Statutory Authority
### ("Professional Degree" Definition)

183. Plaintiff States incorporate by reference the allegations in the preceding paragraphs.

184. The Department is an "agency" under the APA. 5 U.S.C. § 551(1).

185. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "in in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

186. H.R. 1, 20 U.S.C. § 1087e(C)(ii), adopts 34 C.F.R. § 668.2's definition of a professional degree as it existed at the time of H.R. 1's enactment. This definition requires a program of study to meet three criteria to be considered a professional degree: the degree must (1) "signif[y] completion of the academic requirements for beginning practice in a given profession"; (2) signify "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) and "generally require[]" professional licensure. 34 C.F.R. § 668.2.

187. The Final Rule adds several requirements to the definition of "professional degree."

188. The Final Rule is thus contrary to H.R. 1.

189. A federal "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Congress expressly

defined what constitutes a professional degree for the purpose of determining borrowing caps. Congress did not request or direct the Department to alter the definition by allowing it to create additional factors to the three-part operative test.  The Department cannot substitute its own judgment for the judgment of Congress by "tack[ing] on additional criteria," *see Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73–74 (D.C. Cir. 2016), nor can it add regulatory criteria that conflict with the underlying statute.  *Dalton v. United States*, 816 F.2d 971, 974 (4th Cir. 1987) ("[E]very regulation and rule must be consistent with the terms and provisions of the statute[.]").

190.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Final Rule violates the APA because the "professional degree" definition is contrary to law and in excess of the Department's authority.

191.    Plaintiff States are entitled to vacatur of the "professional degree" definition in the Final Rule pursuant to 5 U.S.C. § 706 and a permanent injunction preventing the implementation of the "professional degree" definition in the Final Rule.

### Count II
### Violation of the Administrative Procedure Act —
### Arbitrary and Capricious
### ("Professional Degree" Definition)

192.    Plaintiff States incorporate by reference the allegations in the preceding paragraphs.

193.    The Department is an "agency" under the APA. 5 U.S.C. § 551(1).

194.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

195.    The Final Rule is arbitrary and capricious because, among other things, its definition of "professional degree" is unreasoned; relies on factors Congress did not direct the Department to consider; and fails to consider disadvantages, reasonable alternatives, and reliance interests.  Specifically, the definition arbitrarily relies on factors (such as whether an occupation is

subject to supervision and the "historical context" of the Department's regulation) that are not envisioned by the statute; applies those factors inconsistently; fails to adequately explain the Department's rejection of alternative definitions; and fails to exercise the Department's separate statutory authority to set higher loan limits for certain programs.

196.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Final Rule violates the APA because the definition of "professional degree" is arbitrary and capricious.

197.    Plaintiff States are entitled to vacatur of the "professional degree" definition in the Final Rule pursuant to 5 U.S.C. § 706 and a permanent injunction preventing the implementation of the "professional degree" definition in the Final Rule.

### Count III
### Violation of the Administrative Procedure Act —
### Contrary to Law and in Excess of Statutory Authority
### (Grandfathering Provisions)

198.    Plaintiff States incorporate by reference the allegations in the preceding paragraphs.

199.    The Department is an "agency" under the APA.  5 U.S.C. § 551(1).

200.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "in in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

201.    H.R. 1's Grandfathering Provision, 20 U.S.C. § 1087e(8)(A), states that H.R. 1's new loan limits "shall not apply" to certain currently enrolled students for an interim time period so long as two statutory criteria are met.

202.    The Final Rule adds several more requirements to the Grandfathering Provision.

203.    The Final Rule is thus contrary to H.R. 1.

38

204.    A federal "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Congress expressly defined the criteria that would determine when a student is covered by the Grandfathering Provision.  The Department has no authority "to tack on additional criteria" that would alter that definition.  *See Cent. United Life Ins. Co.*, 827 F.3d at 73–74; *Dalton*, 816 F.2d at 974 ("[E]very regulation and rule must be consistent with the terms and provisions of the statute[.]").

205.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the extraneous limits on the Grandfathering Provision in the Final Rule violate the APA because those provisions are contrary to law and in excess of the Department's authority.

206.    Plaintiff States are entitled to vacatur of the erroneous portions of the grandfathering provisions in the Final Rule and a permanent injunction preventing the implementation of those provisions.

**Count IV**
**Violation of the Administrative Procedure Act —**
**Arbitrary and Capricious**
**(Grandfathering Provisions)**

207.    Plaintiff States incorporate by reference the allegations in the preceding paragraphs.

208.    The Department is an "agency" under the APA.  5 U.S.C. § 551(1).

209.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).

210.    The Final Rule's additional limits on H.R. 1's Grandfathering Provision are arbitrary and capricious because they are unreasoned; rely on factors Congress did not direct the Department to consider; and fail to consider disadvantages, reasonable alternatives, and reliance interests.  Among other things, these provisions ignore several important matters bearing on the Grandfathering Provision's applicability to withdrawals and transfer students; fail to consider the

39

Department's application of similar statutory and regulatory requirements; and fail to adequately explain the Department's reasoning.

211.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the erroneous portions of the grandfathering provisions in the Final Rule violate the APA because those provisions are contrary to law and in excess of the Department's authority.

212.    Plaintiff States are entitled to vacatur of the erroneous portions of the grandfathering provisions in the Final Rule and a permanent injunction preventing the implementation of those provisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

i.      Issue a judicial declaration that the Final Rule's regulatory definition of "professional degrees" is unlawful because it violates the Administrative Procedure Act; and that the treatment of withdrawals and transfers for purposes of the Grandfathering Provision is unlawful because it violates the Administrative Procedure Act.

ii.     Pursuant to 5 U.S.C. § 706, vacate the challenged portions of the Final Rule;

iii.    Enjoin the challenged portions of the Final Rule and their implementation as to Plaintiff States;[1]

iv.     Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v.      Grant other such relief as this Court may deem proper.


Dated: May 19, 2026                              Respectfully submitted,

---

[1] Plaintiff States include their instrumentalities and subdivisions.

40

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (D. Md. Bar. No. 31543)
Michael Drezner (D. Md. Bar. No. 31784)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.maryland.gov

*Counsel for the State of Maryland*


**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
  *Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*


**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By */s/ William Y. Durbin*
William Y. Durbin*
  *Senior Litigation Counsel*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
William.Durbin@azag.gov
ACL@azag.gov

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Jessica Ranucci*
Jessica Ranucci*
  *Special Counsel*
Victoria Ochoa*
Shanna Tallarico*
  *Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov

*Counsel for the State of New York*


**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Martha U. Fulford*
Martha Upton Fulford*
  *Assistant Deputy Attorney General*
Erin Farinelli*
Sam Wolter*
  *Assistant Attorneys General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
martha.fulford@coag.gov

*Counsel for the State of Colorado*


**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Caroline E. Wilson*
Caroline E. Wilson*
Daniel A. Osborn*
  *Deputy Attorneys General*
Nicklas A. Akers
  *Senior Assistant Attorney General*
Bernard A. Eskandari
  *Supervising Deputy Attorney General*

41

*Counsel for the State of Arizona*

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Callie.Wilson@doj.ca.gov
Daniel.Osborn@doj.ca.gov

*Counsel for the People of the State of California*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Mary Lenehan*
Mary Lenehan*
  *Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Mary.Lenehan@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: */s/ Vanessa L. Kassab*
Vanessa L. Kassab*
  *Deputy Attorney General*
Anuradha Sivaram*
  *Special Assistant Attorney General*
Ian R. Liston
  *Director of Impact Litigation*
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

By: */s/ Eliza H. Simon*
Eliza H. Simon (D. Md. Bar No. 19648)
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, N.W., 9th Floor
Washington, D.C. 20001
(202) 741-5221
Eliza.Simon@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
David D. Day*
  *Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
david.d.day@hawaii.gov

*Counsel for the State of Hawaiʻi*

42

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Aleeza Strubel*
Aleeza Strubel*
  *Complex Litigation Counsel*
Margaret McWhorter*
  *Student Loan Ombuds*
Lilia De La Torre*
  *Supervising Attorney*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (773) 519-3000
Aleeza.Strubel@ilag.gov
Margaret.McWhorter@ilag.gov
Lilia.Delatorre@ilag.gov

*Counsel for the State of Illinois*


**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
  *Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  (207) 626-8455
Fax:  (207) 287-3145
Kate.Thompson@maine.gov

*Counsel for the State of Maine*


**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Daniel Ping*
Daniel Ping*
Neil Giovanatti*
  *Assistant Attorneys General*


**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

By: */s/ S. Travis Mayo*
S. Travis Mayo*
  *General Counsel*
Sam Flynn
  *Chief Deputy General Counsel*
Laura C. Tipton
  *Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov

*Counsel for the Office of the Governor*


**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Laila M. Ameri*
Laila M. Ameri*
  *Assistant Attorney General*
Nita Klunder*
  *State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
Laila.Ameri@mass.gov
Nita.Klunder@mass.gov

*Counsel for the Commonwealth of Massachusetts*


**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Adam Welle*
Adam Welle*
  *Assistant Attorney General*
445 Minnesota Street, Suite 600

43

Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 241-1050
PingD@michigan.gov
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Joshua P. Bohn*
Joshua P. Bohn*
  *Deputy Attorney General*
Division of Law—Special Litigation
Office of the Attorney General
25 Market Street
P.O. Box 112
Trenton, NJ  08625
(P) 609-696-5366
Joshua.Bohn@law.njoag.gov

*Counsel for the State of New Jersey*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By */s/ Daniel T. Wilkes*
Daniel T. Wilkes*
  *Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6415
dwilkes@ncdoj.gov

*Counsel for the State of North Carolina*

**JOSH SHAPIRO**

St. Paul, Minnesota, 55101
(651) 757-1425
Adam.Welle@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Justin McCarthy*
Justin McCarthy*
  *Assistant Solicitor General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
(505) 490-7741
jmccarthy@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s/ Leanne Hartmann*
Leanne Hartmann*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

44

IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Michael J. Fischer*
Michael J. Fischer*
  *Executive Deputy General Counsel*
Jennifer Selber
  *General Counsel*
Governor's Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA  17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Samuel B. Stratton*
Samuel B. Stratton*
  *Assistant Attorney General*
109 State Street
Montpelier, VT  05609
(802) 828-2153
sam.stratton@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ Aaron J. Fickes*
Aaron J. Fickes*
  *Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-287-4176
aaron.fickes@atg.wa.gov

*Counsel for the State of Washington*

By: */s/ Jordan Broadbent*
Jordan Broadbent*
  *Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
Jbroadbent@riag.ri.gov

*Counsel for the State of Rhode Island*

**JAY JONES**
ATTORNEY GENERAL OF VIRGINIA

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
  *Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 786-2071
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Faye Hipsman*
Faye Hipsman*
  *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI  53707
(608) 957-5218 (phone)
(608) 294-2907 (fax)
Faye.Hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

45

*\* Pro hac vice application forthcoming*