**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARLYAND**

| | |
|---|---|
| STATE OF MARYLAND, STATE OF NEW YORK, STATE OF NEVADA, STATE OF COLORADO, STATE OF ARIZONA, PEOPLE OF THE STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAI‘I, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR *ex rel. Andy Beshear, in his official capacity as Governor of the* COMMONWEALTH OF KENTUCKY, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, JOSH SHAPIRO, *in his official capacity as Governor of* the COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, LINDA McMAHON, *in her official capacity as United States Secretary of Education*,<br><br>Defendants. | Case No. 1:26-cv-01957-ABA |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. The William D. Ford Federal Direct Loan Program and H.R. 1 ..... 2

II. The Rule ..... 3

III. The Harm to Plaintiff States from the Rule ..... 6

IV. Procedural History ..... 9

LEGAL STANDARD ..... 9

ARGUMENT ..... 10

I. Plaintiff States Have Standing ..... 10

II. The Final Rule Violates the Administrative Procedure Act. ..... 11

A. The Final Rule's Definition of Professional Degree is Contrary to Law. ..... 11

B. The Final Rule's Definition of Professional Degree Is Arbitrary and Capricious. ..... 16

1. The Department Arbitrarily Relied on Non-statutory Factors in Defining "Professional Degree." ..... 16

2. Defendants Ignored an Important Aspect of the Problem When Declining to Exercise the Secretary's Authority to Set Higher Loan Limits for Certain Health Professions Programs. ..... 19

C. The Final Rule's Limits on H.R. 1's Grandfathering Provision are Contrary to Law ..... 21

D. The Final Rule's Limits on H.R. 1's Grandfathering Provision Are Arbitrary and Capricious ..... 23

III. The Final Rule Should Be Vacated and the Court Should Enter an Injunction and Award Declaratory Relief. ..... 26

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

## Case Law


*Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419 (4th Cir. 1998) ................................ 30

*Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321 (4th Cir. 1937) ............................................ 29, 30

*Am. Ass'n of Nurse Pracs. v. McMahon*, No. CV 26-1780, 2026 WL 1826176 (D.D.C. June 24, 2026) ........................................................................................................ passim

*Am. Fed'n of Teachers v. U.S. Dep't of Educ.*, 796 F. Supp. 3d 66 (D. Md. 2025)....................... 26

*Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 26-CV-12443-PBS, 2026 WL 2294606 (D. Mass. Aug. 10, 2026) ........................................................................................ 9, 13

*Amador v. Mnuchin*, 476 F. Supp. 3d 125 (D. Md. 2020)...........................................................11

*Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020) .................................. 29

*Benitez v. Charlotte-Mecklenburg Hosp. Auth.*, 992 F.3d 229 (4th Cir. 2021) ............................ 15

*Bloomberg L.P. v. SEC*, 45 F.4th 462 (D.C. Cir. 2022) ............................................................. 25

*Branch v. Smith*, 538 U.S. 254 (2003) ........................................................................................ 20

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ........................................................................ 28

*Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70 (D.C. Cir. 2016) .......................................... 14

*Centennial Life Ins. Co. v. Poston*, 88 F.3d 255 (4th Cir. 1996)................................................. 29

*Child Trends v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700 (D. Md. 2025) ............................. 10, 26

*City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021)............................................ 26

*Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963 (4th Cir. 1994) ......................................................... 10

*Corner Post v. Bd. of Gov'rs of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ....................................... 26

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................................ 25

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ..................................................... 10, 27

*Encino Motorcars v. Navarro*, 579 U.S. 211 (2016)....................................................... 21, 23, 25

*FCC v. NextWave Pers. Commc'ns*, 537 U.S. 293 (2003) .......... 26

*FDA v. Wages & White Lion Inv'ts*, 604 U.S. 542 (2025) .......... 21

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) .......... 14, 15

*Hussain v. Gonzales*, 477 F.3d 153 (4th Cir. 2007) .......... 27

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977) .......... 29

*Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314 (4th Cir. 2021) .......... 24

*La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355 (1986) .......... 14

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......... 12, 18

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025) .......... 29

*Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) .......... 10, 24, 27

*Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025) .......... 2

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......... 16, 19, 20

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) .......... 15

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994) .......... 27

*N.C. Growers' Ass'n v. Solis*, 644 F. Supp. 2d 664 (M.D.N.C. 2009) .......... 28

*Nat'l Ass'n of Home Builders v. Def'rs of Wildlife*, 551 U.S. 644 (2007) .......... 20

*Nat'l Ass'n of Patients on Hemodialysis & Transplantation v. Heckler*, 588 F. Supp. 1108 (D.D.C. 1984) .......... 23

*Nautilus Ins. Co. v. Winchester Homes*, 15 F.3d 371 (4th Cir. 1994) .......... 10

*NFIB v. OSHA*, 595 U.S. 109 (2022) .......... 11

*Nken v. Holder*, 556 U.S. 418 (2009) .......... 29

*North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291 (4th Cir. 2010) .......... 26

*Ohio v. EPA*, 603 U.S. 279 (2024) .......... 19, 20, 25

*PBM Prods. v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011) ........................................... 28

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ........................................................................ 15

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020)........................................................................ 29

*S.C. State Conf. of the NAACP v. Weaver*, 181 F.4th 353 (4th Cir. 2026) ....................................11

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ........................................................................ 12

*Tataranowicz v. Sullivan*, 959 F.2d 268 (D.C. Cir. 1992) .......................................................... 25

*United States v. Hawley*, 919 F.3d 252 (4th Cir. 2019)............................................................... 13

*United States v. Helton*, 944 F.3d 198 (4th Cir. 2019) ............................................................. 13

*United States v. McCarthy*, 174 F.4th 1254 (10th Cir. 2026)...................................................... 16

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffler*, 527 U.S. 371 (2003)........................................................................................................................ 15

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................................................ 27

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440 (D.R.I. 2025).............................................................................................................. 10, 26

*Yates v. United States*, 574 U.S. 528 (2015)........................................................................ 14, 15

**Statutes and Regulations**

5 U.S.C. § 706.......................................................................................................... passim

20 U.S.C. § 1001........................................................................................................ 24

20 U.S.C. § 1078-8 .................................................................................................. passim

20 U.S.C. § 1087e..................................................................................................... passim

20 U.S.C. § 1098a........................................................................................................ 3

42 U.S.C. § 292b........................................................................................................ 19

Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) ................................................................ passim

Fed. R. Civ. P. 56........................................................................................................ 10

34 C.F.R. § 668.2 ........ passim

34 C.F.R. § 685.102 ........ 5, 12, 13

34 C.F.R. § 685.214 ........ 22, 23

90 Fed. Reg. 4254 (Jan. 30, 2026) ........ passim

91 Fed. Reg. 23,768 (May 1, 2026) ........ passim

**Miscellaneous Authorities**

U.S. Dep't of Educ., Electronic Announcement General 26-42, Update to List of Professional Degree Programs Due to Court Order ........ 9

U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *Introduction to the Classification of Instruction Programs* 1 (2010 ed.) ........ 4

## INTRODUCTION

The U.S. Department of Education seeks to exclude hundreds of thousands of students in critical health care and other programs from the definition of "professional degree," preventing them from accessing the full amount of federal student loans that Congress intended to make available. Under the One Big Beautiful Bill Act ("H.R. 1"), Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025), Congress imposed new borrowing limits on federal student loans, but allowed students pursuing "professional" degrees access to a higher loan cap. Congress defined professional degree by incorporating a pre-existing regulatory definition under which a "professional degree" (1) "signifies [ ] completion of the academic requirements for beginning practice in a given profession," (2) entails "a level of professional skill beyond that normally required for a bachelor's degree," and (3) permits entry into a profession for which "[p]rofessional licensure is [ ] generally required." 34 C.F.R. § 668.2 (2025), *incorporated by* 20 U.S.C. § 1087e(a)(4)(C)(ii). In the Final Rule challenged here, however, the Department has impermissibly narrowed Congress's definition, cutting off access to the higher loan limits for nurses, physician assistants, and other professionals. The Department also has wrongly denied protection Congress intended for current borrowers by excluding transfer students and others from H.R. 1's grandfathering provisions.

Plaintiff States—who operate degree programs and employ professionals in fields wrongly excluded from the definition of professional degree—are harmed by those portions of the Final Rule. The Final Rule's definition of professional degree and its limits on H.R. 1's grandfathering provisions contravene H.R. 1 and are therefore contrary to law in violation of the Administrative Procedure Act ("APA"). Those portions of the Rule also are arbitrary and capricious because the Department relied on factors Congress did not intend it to consider, applied those factors inconsistently, and failed to adequately explain its decision or to consider all relevant information.

The Court should declare the challenged portions of the Final Rule unlawful, vacate them, and issue injunctive and declaratory relief as set forth in the accompanying Proposed Order.

## BACKGROUND

### I. The William D. Ford Federal Direct Loan Program and H.R. 1

Congress created the William D. Ford Federal Direct Loan ("Direct Loan") program in 1993 to enable the federal government to directly lend to students for post-secondary studies. *Missouri v. Trump*, 128 F.4th 979, 986 (8th Cir. 2025). Plaintiff States and their universities benefit from Direct Loans in several ways. First, Direct Loans are not underwritten for credit risk and do not require a cosigner, so they are available to all students no matter their wealth or status. That ensures universities can make admissions decisions based on students' abilities, not their credit history or bank balances. *See, e.g.*, Or. State Univ. Cmt., Ex. 1, A.R. 7459; Univ. of Ill. Sys. Cmt., Ex. 2, A.R. 6480. Second, the availability of Direct Loans is not tethered to private credit markets. Universities can budget for future years knowing that admitted students will be able to pay tuition, without needing to worry about the "capacity or intent" of "the private lending market." *E.g.*, Or. State Univ. Cmt., Ex. 1, A.R. 7459. And third, Direct Loans may have lower interest rates and allow graduates to take advantage of loan-repayment programs such as Public Service Loan Forgiveness (PSLF). Lower monthly payments and potential loan forgiveness both make it easier for graduates to accept jobs at public universities or state agencies despite comparatively lower pay, thereby increasing the talent pool available to public employers. *See, e.g.*, City & County of San Francisco Cmt., Ex. 3, A.R. 9034; Univ. of Ill. Sys. Cmt., Ex. 2, A.R. 6480–81.

Last year, H.R. 1 made substantial changes to the Direct Loan program. As relevant, H.R. 1 created new annual and aggregate limits on the value of loans that graduate and professional students may borrow. Beginning July 1, 2026, graduate students may take out up to $20,500

annually ($100,000 in aggregate), while "professional" students may borrow more: up to $50,000 annually ($200,000 in aggregate). 20 U.S.C. § 1087e(a)(4). H.R. 1 also imposed a new "[l]ifetime maximum aggregate amount" for student borrowing. *Id.* § 1087e(a)(6).

To distinguish graduate and professional programs, H.R. 1 adopted the definition of "professional degree" in 34 C.F.R. § 668.2, "as in effect on the date of [H.R. 1's] enactment." 20 U.S.C. § 1087e(a)(4)(C)(ii). 34 C.F.R. § 668.2 (2025) defined "professional degree" as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

H.R. 1 also included a section (the "Grandfathering Provision") that allows current students to finish their studies without being subject to the new loan limits. 20 U.S.C. § 1087e(a)(8). The Grandfathering Provision excludes from H.R. 1's loan limits students who had borrowed a federal loan and were "enrolled in a program of study at an institution of higher education" as of June 30, 2026, for the duration of their "expected time to credential" (up to "three academic years"). *Id.*

## II. The Rule

After H.R. 1 was enacted, the Department held a negotiated rulemaking to, among other things, add a new regulatory definition of "professional degree."[1] The Department then issued a notice of proposed rulemaking ("NPRM") that proposed a new definition of "professional degree" and limited the application of the Grandfathering Provision. 90 Fed. Reg. 4254, 4332 (Jan. 30,

---

[1] Negotiated rulemaking is a statutorily mandated process in which the Department must seek input from various constituencies for proposed student loan regulations. 20 U.S.C. § 1098a(b).

2026). Over 80,000 comments were submitted in response to the NPRM, about 97% of which opposed the proposals. Compl., ECF 1, ¶ 65. Plaintiff States submitted a comment explaining that the proposed definition of professional degree was contrary to H.R. 1, arbitrary, capricious, and harmful; they urged the Department to abandon it. Pl. States' Cmt., Ex. 4, A.R. 6580–95.

Despite the nearly uniform opposition to the NPRM, the Final Rule adopts verbatim the NPRM's definition of "professional degree":

> (i) A professional degree is a degree that:
>
> > (A) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
> >
> > (B) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;
> >
> > (C) Generally requires professional licensure to begin practice; and
> >
> > (D) Includes a four-digit program CIP[2] code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition.
>
> (ii) A professional degree may be awarded in the following fields:
>
> > (A) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

---

[2] Classification of Instruction Programs (CIP) codes are six-digit numbers that were developed by the Department to track and report instructional programs for statistical purposes. U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *Introduction to the Classification of Instruction Programs* 1 (2010 ed.), https://perma.cc/UJ74-KG3R. The first two digits indicate a broad subject area, such as "51—Health Professions and Related Programs,"; the first four digits indicate a subgrouping within that subject area, such as "51.38—Registered Nursing, Nursing Administration, Nursing Research and Clinical Nursing"; and the full six digits indicate individual programs, such as "51.3801 (Registered Nursing / Registered Nurse)." *Id.* at 2.

> . . .
>
> (iii) A professional student under this definition:
>
> . . .
>
> > (B) Must be enrolled in a program leading to a professional degree under paragraph (ii) of this definition.

34 C.F.R. § 685.102(b) (effective July 1, 2026), *added by* 91 Fed. Reg. 23,768 (May 1, 2026) ("Final Rule"). In applying that definition, the Final Rule determines that only the programs mentioned in the statutory definition's illustrative list, plus clinical psychology, qualify as "professional degrees." Final Rule at 23,882. Put another way, the Final Rule transforms the statute's illustrative list into an exhaustive list, with the sole addition of clinical psychology.

The Final Rule excludes from classification as professional degrees many programs that it explicitly concedes meet the three-part statutory definition, such as the Master of Science in Nursing, *id.* at 23,795; the Doctor of Nursing Practice, *id.* at 23,797; the DNP in Nurse Anesthesia and Doctor of Nurse Anesthesia Practice, *id.* at 23,798; the Master of Science in Athletic Training, *id.* at 23,805; master's programs in Certified Anesthesiologist Assistance, *id.*; master's programs in Speech-Language Pathology, *id.* at 23,807; and the Doctor of Audiology. *Id.* It also excludes post-baccalaureate degrees in physician assistance, physical therapy, and occupational therapy, which it acknowledges entail at least "a master's level entry credential, national examination," and "formal licensure structure," *e.g.*, *id.* at 23,800, and therefore meet the three elements of the statutory test. *See* 34 C.F.R. § 668.2 (2025). The Final Rule relies on non-statutory criteria to avoid treating all these programs as professional degrees. *See, e.g.*, Final Rule at 23,796–97.

Compounding this error, the Final Rule also "declines to use [the Secretary of Education's] authority in section 428H(d) of the [Higher Education Act (HEA)]," 20 U.S.C. § 1078-8(d), to increase the loan limits for healthcare programs. Final Rule at 23,818. Section 428H(d) authorizes

the Secretary to increase loan limits "in cases where the Secretary determines that a higher amount is warranted . . . with respect to students engaged in specialized training requiring exceptionally high costs of education." 20 U.S.C. § 1078-8(d). "The Secretary previously used [this] authority . . . to grant access to higher loan limits to students in certain health profession programs," Final Rule at 23,818, such as physicians, public health students, and health administrators. Although H.R. 1 did not repeal section 428H(d), the Final Rule states that "the increased . . . limits" allowed by that statute "will not apply to loans made on or after July 1, 2026." Final Rule at 23,818.

Finally, the Final Rule limits H.R. 1's Grandfathering Provision. *Id.* at 23,883–84. Transfer students who change institutions, "even in the same program of study," are "consider[ed] . . . to be [enrolled in] a new program of study" and ineligible for the interim exception to the loan limits. *Id.* at 23,814. Similarly, "[a] borrower who officially withdraws or otherwise ceases to be enrolled would lose continued eligibility under the interim exception." *Id.* at 23,813. And "students who are enrolled in an associate's degree program and transfer into a bachelor's degree program" are "treat[ed] . . . as enrolling in a new program of study . . . even if the student is under an articulation or transfer agreement or if an associate degree has not been awarded at the time of transfer." *Id.* at 23,821–22. None of those limitations expressly appear in H.R. 1. *See* 20 U.S.C. § 1087e(a)(8).

## III. The Harm to Plaintiff States from the Rule

Under the Final Rule, numerous post-baccalaureate programs offered by Plaintiff States—many of which the Department concedes meet the statutory criteria—are excluded from the higher loan limits available for students pursuing professional degrees. Many students in these programs will no longer have access to sufficient federal loans and will need to seek private loans to cover the cost of attendance. *E.g.*, Dickson Decl. (Conn.), Ex. 19, ¶¶ 14–16; Jarrell Decl. (Md.), Ex. 30, ¶¶ 18–20; Haggerty Decl. (Or.), Ex. 48, ¶¶ 13–15; Litwack Decl. (Wis.) Ex. 57, ¶¶ 18, 20.

These changes cause financial injuries to Plaintiff States. Some students will be unable to obtain private loans because they cannot find a cosigner. Other students, faced with higher interest rates and other unfavorable terms, will choose not to pursue a post-baccalaureate degree. The result will be fewer students enrolling in Plaintiff States' programs, which will directly translate into lower revenue. *E.g.*, Pugliesi Decl. (Ariz.), Ex. 12, ¶¶ 17–19; Newman Decl. (Cal.), Ex. 16, ¶ 20; Holloway Decl. (Colo.), Ex. 18, ¶¶ 12, 14; Wolfe Decl. (R.I.), Ex. 50, ¶¶ 16–20.

The Final Rule also disrupts state institutions' ability to operate and sustain academic programs. Post-baccalaureate programs depend on a predictable pipeline of graduates with advanced degrees to serve as faculty and clinical supervisors. By lowering nationwide enrollment in the affected programs, the Final Rule shrinks the future faculty pool. *E.g.*, Halbert Decl. (Haw.), Ex. 23, ¶ 25; Serio Decl. (Wash.), Ex. 55, ¶¶ 23, 32, 41; Johnson Decl. (Vt.), Ex. 51, ¶ 22. At the same time, students saddled with more expensive debt and whose private loans have limited flexibility for repayment will be less likely to pursue careers in academia. Instead, a larger proportion of those students will go to higher-paying jobs in the private sector. *E.g.*, Grommo Decl. (Cal.), Ex. 15, ¶ 25; McCarron Decl. (Ill.), Ex. 24, ¶ 20; Mauro Decl. (N.Y.), Ex. 46, ¶ 12. Plaintiff States' health profession programs already face faculty shortages and are constrained by mandated low student-faculty ratios and the need to provide hands-on training in highly technical fields. A smaller faculty pool would therefore limit the number of students Plaintiff States' universities could admit, which would continue to decrease the supply of potential new instructors and impede universities' ability to support undergraduate programs that are not directly subject to the loan caps. *E.g.*, Halbert Decl. (Haw.), Ex. 23, ¶¶ 25–26; Jarrell Decl. (Md.), Ex. 30, ¶¶ 24–25.

The Final Rule will further harm Plaintiff States by exacerbating their shortage of healthcare practitioners. For example, the District of Columbia is suffering from an 82% shortage

of physician assistants and a 24% shortage of Advanced Practice Nurse Practitioners (APRNs). Beckwith Decl. (D.C.), Ex. 21, ¶ 15. Lower enrollment in healthcare programs that should be classified as professional degrees but are excluded by the Final Rule will lead to fewer graduates to fill these gaps, leading to even worse shortfalls. *Id.* ¶¶ 21–25; *e.g.*, Pugliesi Decl. (Ariz.), Ex. 12, ¶¶ 23–24; Jarrell Decl. (Md.), Ex. 30, ¶¶ 26–27. This problem will be especially acute for Plaintiff States' public healthcare facilities, which already struggle to compete on salary and will be less able to rely on PSLF and other loan-forgiveness programs to attract students with private loans. *E.g.*, Stack Decl. (Ky.), Ex. 28, ¶¶ 24–26; Gould Decl. (Me.), Ex. 29, ¶¶ 21, 23–24; Taylor Decl. (Md.), Ex. 32, ¶¶ 7, 14; Claggett Decl. (Pa.), Ex. 49, ¶¶ 17, 22, 27–28. In some cases, such as in correctional healthcare, Plaintiff States have a legal duty to hire sufficient medical staff, and they will have no choice but to devote more tax money to employ healthcare practitioners in order to comply with their duties. Langley Decl. (N.C.), Ex. 47, ¶¶ 13–16, 22–23, 27.

The Final Rule's restrictions on grandfathering create additional immediate injuries. By imposing new barriers to transfer and reenrollment, the Final Rule reduces the number of students able to complete post-baccalaureate programs at Plaintiffs' institutions, diminishing their revenue. *E.g.*, McCarron Decl. (Ill.), Ex. 24, ¶ 22; Jarrell Decl. (Md.), Ex. 30, ¶¶ 28–29; Serio Decl. (Wash.), Ex. 55, ¶ 48. Students who must transfer or temporarily withdraw for academic, professional, or personal reasons may be forced to restart programs under the new, more restrictive borrowing limits. *E.g.*, Delaney Decl. (Minn.), Ex. 35, ¶ 16; Birdsell Decl. (N.J.), Ex. 38, ¶ 46; Mauro Decl. (N.Y.), Ex. 46, ¶ 30. Likewise, students moving from one degree level to another within a program may be excluded from grandfathering solely because of the program's structure. *E.g.*, Grommo Decl. (Cal.), Ex. 15, ¶ 29; Halbert Decl. (Haw.), Ex. 23, ¶ 30–31; Zahner Decl. (Wis.), Ex. 58, ¶¶ 33–34. These constraints will reduce students' flexibility and disrupt universities' programs.

### IV. Procedural History

On May 19, 2026, Plaintiffs filed this action. On July 28, the Court granted the parties' joint motion for a briefing schedule for cross-motions for summary judgment. Doc No. 90.

In the meantime, several other lawsuits challenged aspects of the Rule.[3] On June 24, 2026, the U.S. District Court for the District of Columbia "preliminarily set aside and stay[ed] implementation of the regulatory definition of 'professional degree'" on the basis that the Rule was likely contrary to law. *Am. Ass'n of Nurse Pracs. v. McMahon*, No. CV 26-1780, 2026 WL 1826176, at *24 (D.D.C. June 24, 2026) ("*AANP*"). A few days later, the Department issued interim guidance that included a list of programs it would "treat[ ] . . . as awarding professional degrees for the purpose of administering statutory loan limits" for the "duration of the [D.C.] Court's preliminary stay."[4] On August 10, 2026, the U.S. District Court for the District of Massachusetts also found that the Rule was likely contrary to law; that Court declined to issue a preliminary injunction, reasoning that the Department's interim guidance relieved the immediate harm to students in programs deemed "professional" under it. *Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 26-CV-12443-PBS, 2026 WL 2294606, at *10–13 (D. Mass. Aug. 10, 2026) ("*ANA*").

## LEGAL STANDARD

The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

[3] *AFL-CIO v. U.S. Dep't of Educ.*, No. 1:26-cv-02833 (D.D.C); *Am. Ass'n of Nurse Pracs. v. McMahon*, No. 1:26-cv-01780 (D.D.C); *PA Educ. Ass'n v. U.S. Dep't of Educ.,* No. 1:26-cv-01941 (D.D.C); *Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-12443 (D. Mass.); *Ass'n of Accredited Naturopathic Med. Colls. v. McMahon*, No. 3:26-cv-01599 (D. Or.).

[4] U.S. Dep't of Educ., Electronic Announcement General 26-42, Update to List of Professional Degree Programs Due to Court Order (June 29, 2026; Updated July 10, 2026), https://perma.cc/GN2X-EXWU.

accordance with law," or "in excess of statutory jurisdiction." 5 U.S.C. § 706. A court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the parties raise no genuine dispute as to any material facts, so the entire case is ripe for disposition on the merits.

Plaintiff States ask this Court to vacate the challenged provisions of the Final Rule, issue a permanent injunction, and award declaratory relief. "[V]acatur of the rule" is "[t]he normal remedy for a successful APA challenge." *Child Trends v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 730–31 (D. Md. 2025)) (quoting *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 478 (D.R.I. 2025)). For a permanent injunction, a party must show (1) "'actual success' on the merits"; (2) "irreparable injury"; (3) that "remedies available at law, such as monetary damages, are inadequate"; (4) a "balance of hardships" that favors the plaintiff; and (5) that "the public interest would not be disserved by a permanent injunction." *Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020) (en banc) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). For a declaratory judgment, a party must show that a judicial declaration "(i) will serve a useful purpose in clarifying and settling the legal relations in issue; and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 966 (4th Cir. 1994) (quoting *Nautilus Ins. Co. v. Winchester Homes*, 15 F.3d 371, 375 (4th Cir. 1994)).

## ARGUMENT

### I. Plaintiff States Have Standing

A plaintiff has standing when it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *S.C. State Conf. of the NAACP v. Weaver*, 181 F.4th 353, 366–67 (4th Cir.

2026). Plaintiff States meet those elements. First, as explained above, *supra* Background Part IV, Plaintiff States have suffered harms to their pecuniary interests, a "textbook example of injury in fact." *Amador v. Mnuchin*, 476 F. Supp. 3d 125, 147 (D. Md. 2020). Their injuries include lower enrollment in state universities' post-baccalaureate programs and higher employment costs.

Second, the injuries identified are fairly traceable to the Final Rule. It is the Final Rule—not independent actions by students, institutions, or market actors—that fundamentally reshapes the federal financing framework on which Plaintiff States rely to operate and sustain post-baccalaureate academic programs. Nor can the injuries be pinned on H.R. 1: They flow from the parts of the Final Rule that *depart* from H.R. 1, by adding non-statutory criteria to the definition of professional degree and by narrowing the Grandfathering Provision.

For those same reasons, Plaintiff States' injuries are redressable by this Court. As to the programs that the Department concedes meet the statutory criteria, a permanent injunction that required them to be treated as professional degrees would redress the injuries caused by their exclusion. *See Weaver*, 181 F.4th at 371. Vacating the Final Rule's limits on H.R. 1's Grandfathering Provision would likewise reinstate the statute's broader relief for borrowers and redress the harms caused to Plaintiff States by the Final Rule. And declaratory relief would provide certainty to the parties and ensure that Plaintiff States' universities could structure their programs with accurate knowledge of how they would be treated for purposes of student loans.

## II. The Final Rule Violates the Administrative Procedure Act.

### A. The Final Rule's Definition of Professional Degree is Contrary to Law.

"Administrative agencies are creatures of statute" and "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). Under the APA, "courts must exercise independent judgment"—guided by traditional tools of statutory

interpretation—"in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 403 (2024). Here, the Department has contravened the APA by adopting a definition of professional degree that plainly contradicts H.R. 1.

Under H.R. 1, for a degree to be considered professional, it must (1) signify "completion of the academic requirements for beginning practice in a given profession"; (2) signify "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) "generally" require "professional licensure." 34 C.F.R. § 668.2 (2025), *incorporated by* 20 U.S.C. §1087e(a)(4)(C)(ii). With those three criteria, Congress "supplie[d] an unequivocal answer" as to how the term professional degree must be defined, *Digital Realty Tr. v. Somers*, 583 U.S. 149, 160 (2018), and the Department must "follow that definition." *Id.* (quoting *Burgess v. United States*, 553 U.S. 124, 129 (2008)). Instead, the Final Rule adds several more criteria to the definition of professional degree and relies on them to exclude programs that it admits satisfy the statute. *E.g.*, Final Rule at 23,789 ("[W]hile these programs may satisfy the definition's three-part test, they do not satisfy the contextual requirements provided by the illustrative list of advanced degrees included within the definition of *professional student*.").

The Final Rule purportedly derives those additional requirements from the statute's list of ten "[e]xamples of a professional degree." 34 C.F.R. § 668.2 (2025), *incorporated by* 20 U.S.C. § 1087e(a)(4)(C)(ii). Indeed, but for the addition of clinical psychology, the Final Rule's list of professional degrees is identical to the ten examples in the statute. *Compare id. with* 34 C.F.R. § 685.102. But by saying that professional degrees "includ[e] but [are] not limited to" certain "[e]xamples," *id.*, Congress made clear its list was "illustrative rather than exhaustive." *Samantar v. Yousuf*, 560 U.S. 305, 316 (2010). "In fact, '[w]hen "include" is utilized in a statute, it is generally improper to conclude that entities not specifically enumerated are excluded.'" *United*

*States v. Helton*, 944 F.3d 198, 206 (4th Cir. 2019) (quoting *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019)). In *Helton*, for example, the Fourth Circuit held that a "violat[ion] without any form of physical contact" was a "sex offense," even though agency guidelines defined the latter to "*include* all offenses whose elements involve . . . physical contact." *Id.* at 205–07 (internal quotation marks omitted). "By [ ] using 'to include,'" the guidelines "indicated the examples . . . [were] non-exclusive." *Id.* at 206. Here, too, the statute's use of "include" should be "afforded a presumption of nonexclusivity," and the Department's reliance on the illustrative list to exclude programs meeting the statutory definition is "inconsistent with the text." *See id.* at 206–07.

For precisely those reasons, two courts already concluded that "the Department's extrapolated set of new requirements from the list of 'examples' is flawed." *AANP*, 2026 WL 1826176, at *18. "Congress provided, three, and only three, criteria for a program to qualify as a professional degree." *Id.* at *18; *accord ANA*, 2026 WL 2294606, at *11.

The Final Rule impermissibly adds four more criteria to the plain statutory definition of professional degree: (1) The degree "[i]s generally at the doctoral level," 34 C.F.R. § 685.102(b); (2) the degree "requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework," *id.*; (3), licensure is generally required "to begin practice" in the profession, *id.*; and (4) the degree falls within "a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in [the illustrative list plus clinical psychology]." *Id.* In addition, the Rule's preamble indicates that professional degrees must "grant unrestricted ability for holders of those degrees to practice . . . without supervision by a professional licensed in another profession," Final Rule, 91 Fed. Reg. at 23,797, and that "advanced degree, licensure, and certification requirements" cannot be "a recent development" in the field, *id.* at 23,807, although

those two requirements do not appear in the regulation itself (much less the statutory text). None of these additional requirements are anywhere to be found in H.R. 1's statutory definition of professional degree, and they all constitute "material changes to Congress's required definition." *AANP*, 2026 WL 1826176, at *16 (holding that the Rule's definition was contrary to H.R. 1). The Final Rule improperly relies on those requirements to exclude programs such as nursing and speech-language pathology from the definition of professional degree even though it concedes they meet H.R. 1's three-part statutory test. Final Rule at 23,788–89, 23,807.

The Department claims that H.R.1 grants it the authority to narrow the statutory definition of professional degree via the Rule. Not so. The authority of *any* agency to exercise power must be authorized by Congress. *See La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986). And nowhere in H.R. 1 did Congress give the Department "any leeway" to "tack on additional criteria" to its statutory definition of professional degree. *See Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016). Rather, "Congress explicitly directed the Department to apply the preexisting regulatory definition set forth in 34 C.F.R. § 668.2 as the relevant test, and the Department has no power to revise the definition Congress codified or to add additional substantive criteria." *AANP*, 2026 WL 1826176, at *16.

The Department claims that H.R. 1's list of illustrative examples limits professional degrees based on two canons of statutory interpretation. The first, *noscitur a sociis*, holds that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995). The second, *ejusdem generis*, counsels: "[W]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship*

*Estate of Keffler*, 527 U.S. 371, 384 (2003)). But "courts must not [use tools of statutory interpretation] in a way that contravenes plain statutory text." *Benitez v. Charlotte-Mecklenburg Hosp. Auth.*, 992 F.3d 229, 237 (4th Cir. 2021). Defendants have done so here by applying *noscitur a sociis* and *ejusdem generis* to rewrite Congress's definition, "fundamentally misunderstand[ing] and amateurly employ[ing] the canons they purport to rely on." *AANP*, 2026 WL 1826176, at *17.

As a threshold matter, neither of those canons apply because the statute is clear. Courts only apply the canons when a statue leaves a term undefined or ambiguous. *See, e.g.*, *Yates*, 574 U.S. at 544–46; *Gustafson*, 513 U.S. at 574–76. But H.R. 1 defines professional degree explicitly, and "nothing suggests that the 'examples' provided in the [accompanying] list are meant to run the gamut of all possible types of professional degrees such that they would delineate the outermost bounds of the definition." *AANP*, 2026 WL 1826176, at *17. Because the "statutory scheme [here] is coherent and consistent," application of the canons is unnecessary, and the "inquiry [into the statute's meaning] must cease." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 440 (1997).

Yet even if the statutory definition of professional degree were ambiguous—which it is not—the Department could not rely on the canons to rewrite the statute. Courts employ *noscitur a sociis* to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Yates*, 574 U.S. at 543. The Rule here does the opposite, ascribing a definition of professional degree so narrow that it is inconsistent with the accompanying terms in the illustrative list. For example, the Rule limits its definition to doctoral degrees even though the illustrative list includes two master's degrees and the Bachelor of Laws (LLB). *Compare* 34 C.F.R. § 685.102 *with* 34 C.F.R. § 668.2 (2025), *incorporated by* 20 U.S.C. § 1087e(a)(4)(C)(ii). As for *ejusdem generis*, that canon only applies where the terms on a list share a "common denominator." *See Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024). The illustrative list of degrees does

not satisfy this commonality requirement. As the Department admits, *e.g.*, Final Rule at 23,784, the illustrative list contains an array of programs that cannot be reduced to a common denominator—other than that they generally comply with the requirements in the statutory definition. *See United States v. McCarthy*, 174 F.4th 1254, 1263 (10th Cir. 2026) ("related-meaning canons . . . apply only if the specific items have a feature in common").

**B. The Final Rule's Definition of Professional Degree Is Arbitrary and Capricious.**

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action qualifies as arbitrary or capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations and citation omitted). Here, the Final Rule's definition of professional degree is arbitrary and capricious because the Department improperly relied on non-statutory factors Congress did not intend it to consider, and because the Secretary failed to properly exercise her authority to set higher loan limits for certain degrees under the HEA.

**1. The Department Arbitrarily Relied on Non-statutory Factors in Defining Professional Degree.**

The Final Rule's definition of professional degree improperly excludes several fields by "rel[ying] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. As explained *supra* Argument II.A, the Department acted contrary to law in defining professional degree by reference to *any* factors apart from the three that Congress incorporated into H.R. 1. Beyond that, the Department applied the extraneous factors on which it relied arbitrarily. The Department relies on the "illustrative list of degrees provided by Congress" and "the historical

context in which that list was originally developed by the Department" to identify supposed "common characteristics" and exclude degrees that lacked those characteristics. Final Rule at 23,785. But the characteristics the Department identifies are not truly common, and the Department's application of its "historical context" ignores the evolution of professional education and licensure in the decades since its regulation was first adopted. The Department thus cannot show this Court that it has provided a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43.

The Department improperly relies on the illustrative list of degrees to exclude several fields (such as nursing) from the definition of professional degree on the basis that they "ordinarily must be supervised by a licensed professional in a different occupation and cannot be performed independently." Final Rule at 23,787. As an initial matter, the statute does not include a lack-of-supervision requirement, and the Department's derivation of one from "the contextual significance of the illustrative list" is highly questionable. *Id.* In the NPRM, the Department emphasized that most of the degrees are, "with appropriate licensure, sufficient for independent and unsupervised practice in all states," but it admitted that this condition is not common to the theology degrees because "states do not license, supervise, or regulate the practice of religion." NPRM at 4265 n.15. Lack of supervision cannot be a "common characteristic" if, by the Department's admission, it does not apply to all of the degrees on the illustrative list. *See* Final Rule at 23,785.

Furthermore, the Department arbitrarily applied its lack-of-supervision requirement. Most States allow graduates in several of the excluded professions to practice independently. With regard to APRNs such as nurse practitioners, for example, the Final Rule itself recognizes that "[t]hirty-five States" allow them "to practice completely independent of a physician's supervision," and only thirteen States "require [an APRN] to have a relationship with a physician

that outlines procedures the [APRN] may perform and procedures for consulting with the physician." *Id.* Final Rule at 23,796. The Department does not explain why, in formulating a rule of nationwide application, it chose to privilege the views of a minority of States over the rest.

The Department also places far too much weight on the "historic context" of the illustrative list, excluding certain degrees such as Doctor of Physical Therapy primarily on the basis that the Department had not previously "included these degrees in the definition of professional degree." *See* NPRM at 4265–66. This reliance on regulatory history is illogical. Congress adopted the version of 34 C.F.R. § 668.2 "in effect on July 4, 2025," *see* 20 U.S.C. § 1087e(a)(4)(C)(ii))—it did not ask the Department to consult previous versions of that regulation to identify professional degrees. Moreover, in the context of this regulation, the Department's past treatment of particular degrees is not at all "useful in determining the statute's meaning." *Cf. Loper Bright Enters.*, 603 U.S. at 394. Prior to the enactment of H.R. 1, the "definition of the term 'professional degree' . . . served a very limited purpose in the Department's regulations," NPRM at 4262—statistical data collection—so there was no need to update the illustrative list of degrees over time. For instance, the Department never removed the LLB from the illustrative list even though that degree was last conferred by an American law school in 1971. *See id.* Particularly given that the list is, by its terms, non-exhaustive, the absence of a credential from the illustrative list provides little indication of whether Congress expected that degree to be treated as professional.

Similarly, the Final Rule relies on a factor ("degree inflation") that is not in the statute to exclude degrees based on changes in academic requirements over time. For physical therapy and occupational therapy—which according to "[m]any commenters . . . satisf[ied] the 'three-part test'" incorporated into the statute, Final Rule at 23,783—the Rule considers it "dispositive" that both professions only recently "moved to a doctoral-entry model tied to licensure and clinical

training."[5] *See id.* at 23,793–94. The Department expresses concern "that recognizing this shift from the master's level credential to the doctoral level credential as a professional degree could create a moral hazard to incentivize unnecessary degree inflation." *Id.* But the Department points to nothing that suggests "degree inflation" is a statutorily relevant factor in defining professional degrees. And by refusing to recognize that "[p]rofessional education evolves," the Rule threatens to "stifl[e]" the development of new academic fields. Univ. at Buffalo Cmt., Ex. 6, A.R. 6848.

Fundamentally, the Final Rule's definition of professional degree is neither "reasonable" nor "reasonably explained." *See Ohio v. EPA*, 603 U.S. 279, 292 (2024). It therefore is arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).

**2. Defendants Ignored an Important Aspect of the Problem When Declining to Exercise the Secretary's Authority to Set Higher Loan Limits for Certain Health Professions Programs.**

Defendants also acted arbitrarily and capriciously by "entirely fail[ing] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, when the Secretary declined to exercise her authority to increase aggregate loan limits for certain health professions programs. Since 1998, the Secretary had relied on 428H of the HEA, 20 U.S.C. § 1078-8, to increase loan limits for physicians, healthcare administrators, and other health professions students. Final Rule at 23,818; *see* 42 U.S.C. § 292b(a) (listing eligible programs). Although the Final Rule acknowledges the Secretary's authority, Defendants' stated reason for not exercising it here does not address the primary consideration required by the statute: the "exceptionally high costs of education" for health professions programs. 20 U.S.C. § 1078-8(d)(2)(A).

[5] For physical therapy, the change was not very recent: A doctorate has been the required entry-level degree for the past 10 years. Am. Physical Therapy Ass'n Cmt., Ex. 5, A.R. 7188.

The Final Rule indicates that Defendants misunderstood H.R. 1 to have repealed the Secretary's authority to set higher loan limits. Final Rule at 23,818. Specifically, the Rule asserts that "[b]ecause the limits set forth in [H.R. 1] explicitly apply to all Federal Direct Unsubsidized Loans made to graduate and professional students . . . the increased annual and aggregate loan limits established by the Secretary for . . . certain approved health profession programs will not apply to loans made on or after July 1, 2026." *Id.* But H.R. 1 does not expressly override the Secretary's discretionary authority. And there is no "irreconcilable conflict" between H.R. 1 and section 428H(d)(2)(A), so Congress did not impliedly repeal the Secretary's authority either. *See Nat'l Ass'n of Home Builders v. Def'rs of Wildlife*, 551 U.S. 644, 662 (2007) (quoting *Branch v. Smith*, 538 U.S. 254, 273 (2003)). Under H.R. 1, the Secretary remains free to determine "that a higher amount is warranted" under section 428H(d)(2)(A). *See* 20 U.S.C. § 1078-8(d)(2)(A).

In light of the Secretary's clear authority, the Final Rule did not weigh a logically relevant factor: "the unique financial demands of health professions education." Ass'n of Am. Med. Colls. Cmt., Ex. 7, A.R. 13051. Cost of attendance is undeniably an "important aspect" of the regulatory problem that the Secretary must consider, *Ohio v. EPA*, 603 U.S. at 293 (quoting *State Farm*, 463 U.S. at 43)—indeed, it is the principal factor identified in the statute. *See* 20 U.S.C. § 1078-8(d)(2)(A) (allowing the Secretary to increase loan limits for "students engaged in specialized training requiring exceptionally high costs of education"). Yet the Final Rule fails to address cost of attendance at all and therefore arbitrarily fails to supply "a satisfactory explanation for [the agency's] action." *Ohio v. EPA*, 603 U.S. at 294 (quoting *State Farm*, 463 U.S. at 43).

Had the Secretary taken cost of attendance into account, she would have recognized that the new loan limits often are "woefully insufficient" to cover both tuition and additional costs such as "fees, course materials, housing, transportation and personal expenses." *See, e.g.*, Univ. at

Buffalo Cmt., Ex. 6, A.R. 6849. Institutions cannot simply "lower tuition," as the Final Rule assumes, *see* Final Rule at 23,857, because the high cost of attendance for health professions programs reflects a high cost of instruction. *See, e.g.*, Univ. of Wash. Cmt., Ex. 8, A.R. 8637.

Nowhere in its discussion of the Secretary's authority under the HEA does the Final Rule address these highly pertinent cost considerations. Nor does the Final Rule "consider 'serious reliance interests'" that have developed over the three decades the increased loan limits have been in effect. *See FDA v. Wages & White Lion Inv'ts*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016)). Defendants' failure to exercise the Secretary's discretion under section 428H(d)(2)(A) therefore also is arbitrary and capricious.

**C. The Final Rule's Limits on H.R. 1's Grandfathering Provision are Contrary to Law**

The Final Rule's limits on H.R. 1's Grandfathering Provision are, like its definition of professional degree, straightforwardly contrary to law because they contradict the plain language of H.R. 1. H.R. 1 provides that its new loan limits "shall not apply" during [a student's] expected time to credential" (up to a maximum of three years) for any student who has received a loan and is (1) "enrolled in a program of study at an institution of higher education" (2) "as of June 30, 2026." 20 U.S.C. § 1087e(a)(8)(A). H.R. 1 imposes no additional criteria or requirements on students to whom the loan limits "shall not apply." *Id.* But the Rule adds its own requirements to narrow the Grandfathering Provision for students who withdraw and re-enroll, transfer schools, or transfer from an associate's degree to a bachelor's degree within the same academic program.

For students who withdraw and re-enroll, each section of the Final Rule implementing the Grandfathering Provision states that "[i]f the student withdraws in accordance with [34 C.F.R.] § 668.22 or otherwise ceases to be enrolled in the program of study at any point after receiving the

exception," then the student is no longer grandfathered and H.R. 1's new loan limits "shall apply."[6] *See* Final Rule, 91 Fed. Reg. at 23,883. The NPRM attempted to justify this addition by asserting that "[i]f a borrower withdraws, the borrower is no longer enrolled. And the borrower would then be subject to the [new loan limits], if the borrower were to re-enroll or matriculate at another institution." NPRM, 91 Fed. Reg. at 4275. But to be eligible for the Grandfathering Provision, the statute requires only that a borrower (1) "is enrolled in a program of study at an institution of higher education" (2) "as of June 30, 2026." 20 U.S.C. § 1087e(a)(8). Nothing in the Grandfathering Provision mandates that the borrower be enrolled at an institution at *all* dates subsequent to June 30, 2026, nor otherwise indicates Congress' intent to exclude borrowers solely because they temporarily withdraw due to health reasons or other factors.

The Department similarly acted contrary to law in barring otherwise eligible transfer students who continue the same program of study at a different institution—or seek to earn a bachelor's degree rather than an associate's degree at the same institution—from benefitting from the Grandfathering Provision. *See* Final Rule at 23,814. H.R. 1's two statutory criteria do not require a student to remain enrolled in the same institution of higher education, preclude students from seeking a different degree within the same program of study, or require continued enrollment every day after June 30, 2026. And the Rule's treatment of transfer students conflicts with other Department regulations and past practice. *See e.g.* 34 C.F.R. § 685.214(d)(1)(i)(B) (considering, for the purpose of determining whether students who attended a closed school can discharge their loans, whether those students did or "did not complete the program of study at" their school *or* "at

[6] The Final Rule limits the Grandfathering Provision in 34 C.F.R. § 685.200(b)(3) and in several subsections of 34 C.F.R. § 685.203.

another school.”). By excluding students from the Grandfathering Provision when the statute does not, the Final Rule is contrary to law and in excess of Defendants’ statutory authority.

### D. The Final Rule’s Limits on H.R. 1’s Grandfathering Provision Are Arbitrary and Capricious

The Department also has acted arbitrarily and capriciously in violation of the APA by failing to “give adequate reasons” for its limits on H.R. 1’s Grandfathering Provision. *Encino Motorcars*, 579 U.S. at 221. The Department provides no explanation at all for why students who are eligible for grandfathering lose that eligibility if they transfer institutions or temporarily withdraw and re-enroll in the same program of study. The Department’s “failure to articulate reasons is alone sufficient to render the regulations arbitrary and capricious.” *Nat’l Ass’n of Patients on Hemodialysis & Transplantation v. Heckler*, 588 F. Supp. 1108, 1127 (D.D.C. 1984).

Moreover, the Department’s treatment of students who transfer or withdraw and re-enroll blatantly contradicts its treatment of students who change programs of study at a single institution. The Final Rule confirms that an undergraduate student “who changes majors within the same degree or certificate shall be considered to be enrolled in the same program of study.” Final Rule at 23,884. For graduate and professional students, “students who shift within the same 4-digit CIP code at a particular credential level at an institution” are also considered to be enrolled in the same program of study. *Id.* at 23,814. Yet the Department nevertheless concludes that if a student (for instance) transfers to a different institution—“*even in the same program of study*”—that student is enrolled in “a new program of study” and thus subject to the new loan limits. *See id*. (emphasis added); *see also* 34 C.F.R. § 685.214(d)(1)(i)(B). The Department does not even attempt to explain why transfer students who remain in the same program of study at a new institution should be excluded from grandfathering, while identically situated students who “shift” programs within an institution are not. These contradictions provide further evidence that the Department lacks a

reasoned basis to limit H.R. 1's Grandfathering Provision. *See Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").

The Department's treatment of students who transfer from an associate's program into a bachelor's program is similarly deficient. The Final Rule regards "the transfer to a four-year institution as enrolling in a new program of study." Final Rule at 23,821. But as the NPRM acknowledged, such students may "remain[ ] at the same institution or even in the same program" following such a transfer. NPRM at 4270. The sole justification the Final Rule offers is that "Congress envisioned these transfer programs as functionally separate eligible programs," *id.* at 23,822, but the Department's only support for that claim is that another provision of the HEA—not one added by H.R. 1—defines "institution of higher education" to encompass both "an educational program for which the institution awards a bachelor's degree" and "not less than a 2-year program that is acceptable for full credit toward such a degree." 20 U.S.C. § 1001(a)(3); *see* Final Rule at 23,821–22. Section 1001(a)(3) indicates that associate's programs may be linked to bachelor's programs toward which they are "acceptable for full credit," *not* that they are functionally separate. And in any event, the Department identifies nothing in H.R. 1 that suggests Congress intended to exclude transfer students who "remain[ ] at the same institution or even in the same program" from the benefits of grandfathering. *See* NPRM at 4270.

The Final Rule also "is arbitrary and capricious" because it "fail[s] to satisfactorily explain [the Department's] disagreement with the proliferation of negative comments" submitted in response to the proposed limits on the Grandfathering Provision in the NPRM. *See Mayor & City Council of Baltimore*, 973 F.3d at 281. For example, with respect to students who withdraw and

re-enroll, commenters "expressed concern that if [students] withdraw from their program"—perhaps because they "must take time off for personal reasons"—"they will lose the ability to borrow under the legacy limits under the interim exception, even if they subsequently return." *See* Final Rule at 23,813. The Final Rule simply repeats the assertion from the NPRM that "[a] borrower who officially withdraws or otherwise ceases to be enrolled would lose continued eligibility under the interim exception." *Id.*; *see also* NPRM at 4267. The Department's "response did not address the [commenters'] concern so much as sidestep it." *Ohio v. EPA*, 603 U.S. at 295.

In failing to address commenters' concerns, the Department completely ignores the "serious reliance interests that must be taken into account," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars*, 579 U.S. at 212), both for students who have already begun their degree programs and the universities they attend. Indeed, Congress's clear intent in drafting H.R. 1's Grandfathering Provision was "to provide special relief for persons on whom the new regime might bear with unusual severity, . . . because of decisions they are likely to have taken in reliance on the prior regime." *See Tataranowicz v. Sullivan*, 959 F.2d 268, 277 (D.C. Cir. 1992). Comments on the NPRM highlighted the risk of "significant financial disruption to many students' lives," *see* Final Rule at 23,814, as well as "operational risk" for universities due to "the administrative complexity of the [Rule] and the limited time available for implementation." Univ. of Va. Cmt., Ex. 9, A.R. 7169–70; *see also* Univ. of Colo. Boulder Cmt., Ex. 10, A.R. 7451; Univ. of N.C., Chapel Hill Cmt., Ex. 11, A.R. 8159. The Final Rule fails to address those interests at all. *See Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022) ("[I]f public comments raise relevant and significant concerns about the costs associated with a proposed rule, then the agency should provide a reasoned response to those comments."); *cf. North*

*Carolina ex rel. Cooper v. TVA*, 615 F.3d 291, 305 (4th Cir. 2010) ("notice and comment periods" are "designed," in part, to "lower[ ] the likelihood of disturbing reliance interests").

The Final Rule excludes students from H.R. 1's Grandfathering Provision without adequate explanation and overlooks the harms inflicted on those who relied on the loan amounts that were previously available. Because the Department has "failed to respond to 'significant points' and to consider 'all relevant factors' raised by the public comments," *see City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 772 (D. Md. 2021) "its decision [is] arbitrary and capricious." *See id.*

**III. The Final Rule Should Be Vacated and the Court Should Enter an Injunction and Award Declaratory Relief.**

This Court should vacate the Final Rule's professional degree definition and its limits on H.R. 1's Grandfathering Provision as contrary to law and arbitrary and capricious. "The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law[ ]' . . . which means, of course, any law." *See FCC v. NextWave Pers. Commc'ns*, 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). "To set aside means to vacate." *Am. Fed'n of Teachers v. U.S. Dep't of Educ.*, 796 F. Supp. 3d 66, 120 (D. Md. 2025) (citing *Corner Post v. Bd. of Gov'rs of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring)), *appeal dismissed*, No. 25-2228 (4th Cir. Jan. 22, 2026). "The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Child Trends*, 795 F. Supp. 3d at 730–31 (quoting *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 478.

In addition to vacatur, this Court should enter a permanent injunction preventing the Department, with respect to institutions of higher education located within Plaintiff States, from failing to treat as professional degrees eight programs—nursing, athletic training, anesthesiologist assistance, speech-language pathology, audiology, physician assistance, physical therapy, and occupational therapy—that the Final Rule concedes meet the statutory test. A party is entitled to

a permanent injunction if it shows (1) "'actual success' on the merits"; (2) "irreparable injury"; (3) that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (4) that "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (5) that "the public interest would not be disserved by a permanent injunction." *Mayor & City Council of Baltimore*, 973 F.3d at 274 (quoting *eBay Inc.*, 547 U.S. at 391). As established above, Plaintiff States have shown actual success on the merits by demonstrating that the Final Rule's definition of professional degree is contrary to law and arbitrary and capricious. And the Rule already acknowledges that these degrees meet the statutory criteria and—but for the Department's use of non-statutory criteria—would have been classified as professional degrees. *See* Final Rule at 23,794–95, 23,797–98, 23,800, 23,805, 23,807. Nothing further is required to show that these degrees qualify as professional under the statute. *See Hussain v. Gonzales*, 477 F.3d 153, 158 (4th Cir. 2007) ("remand is not always necessary" when the case turns on "a legal, not a factual, conclusion" and "remand . . . would serve no useful purpose").

With respect to the other factors, Plaintiffs have suffered an "irreparable injury" that cannot be remedied at law. Here, the Final Rule will inflict significant economic losses on Plaintiff States for which "monetary damages are difficult to ascertain or are inadequate." *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated in part on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008); *see supra* Background Part IV. First, the Final Rule concedes that institutions of higher education will suffer "a loss of revenue" because they "will receive less loan revenue from the Federal government, . . . some of [which] may not be replaced." *See* Final Rule at 23,856; *accord, e.g.*, Pugliesi Decl. (Ariz.), Ex. 12, ¶ 19; Newman Decl. (Cal.), Ex. 16, ¶ 20; Mulrooney Decl. (Conn.), Ex. 20, ¶¶ 18–19; Farquhar Decl. (Del.), Ex. 22, ¶¶ 18–20, 26; Halbert Decl. (Haw.), Ex. 23, ¶¶ 20–22, 30; McCarron Decl.

(Ill.), Ex. 24, ¶¶ 18, 22; Jarrell Decl. (Md.), Ex. 30, ¶¶ 21–23, 28; Barton Decl. (Mass.), Ex. 33, ¶¶ 22, 59; Delaney Decl. (Minn.), Ex. 35, ¶ 17; Wheatcroft Decl. (N.J.), Ex. 41, ¶¶ 20–22, 25–27; Barrett Decl. (Nev.), Ex. 37, ¶¶ 21–23, 28; Abuhamad Decl. (Va.), Ex. 52, ¶¶ 19–21, 27; Mason Decl. (Wash.), Ex. 54, ¶¶ 19–21; Gartland Decl. (Wis.), Ex. 56, ¶¶ 19–21. Second, fewer graduates will mean fewer applicants to practice in Plaintiff States, which will decrease their agencies' revenue from licensing fees. *E.g.*, Ridenour Decl. (Ariz.), Ex. 13, ¶¶ 13, 21; Jenkins Decl. (Ky.), Ex. 27, ¶¶ 14, 22; Scott Decl. (Md.), Ex. 31, ¶¶ 15, 23; Nagel Decl. (Mich.), Ex. 34, ¶¶ 14, 22; Blozen Decl. (N.J.), Ex. 39, ¶¶ 15, 21, 26; Decker Decl. (N.M.), Ex. 43, ¶¶ 14, 21. And third, fewer graduates will lead to fewer prospective employees for state agencies, which will drive up agencies' hiring costs and/or impede their ability to hire the most qualified staff.[7] *E.g.*, Grommo Decl. (Cal.), Ex. 15, ¶¶ 26–27; Stack Decl. (Ky.), Ex. 28, ¶¶ 24–26; Barton Decl. (Mass.), Ex. 33, ¶ 61; Nagel Decl. (Mich.), Ex. 34, ¶¶ 17–18, 26; Ferguson Decl. (N.M.), Ex. 44, ¶¶ 19, 24; Friesen Decl. (N.Y.), Ex. 45, ¶¶ 14, 19; Langley Decl. (N.C.), Ex. 47, ¶¶ 13–16, 22–23, 26–27; Claggett Decl. (Pa.), Ex. 49, ¶¶ 22, 27; Serio Decl. (Wash.), Ex. 55, ¶¶ 23–24, 32–33. These "economic losses are unrecoverable in that suits for economic damages against the federal government and federal agencies are barred by the sovereign immunity doctrine." *N.C. Growers' Ass'n v. Solis*, 644 F. Supp. 2d 664, 670 (M.D.N.C. 2009). "Because the government is protected by sovereign immunity and no monetary damages are available," Plaintiff States' economic injuries "qualify as

---

[7] The second and third harms will be caused by fewer graduates from private universities as well as public ones. *See, e.g.*, Beckwith Decl. (D.C.), Ex. 21, ¶ 24. Therefore, the injunction should encompass both private and public institutions of higher education within Plaintiff States. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) ("The scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff states."); *see also PBM Prods. v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011) ("An injunction should be carefully addressed to the circumstances of the case.") (internal quotation marks and citations omitted).

irreparable harm." *See Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 122 (D. Md. 2025) (quoting *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020)).

The balance of hardships and public interest factors—which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—also favor an injunction. The public "undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020). Moreover, "[t]he government . . . 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *AANP*, 2026 WL 1826176, at *20. Here, as Plaintiffs have demonstrated (and two courts already concluded), "[t]he Rule's definition of 'professional degree,' and thus the category of students benefiting from the high loan caps, is likely narrower that what Congress intended." *Id.* Even if "more taxpayer dollars will be spent on federal loan subsidies" as a result of an injunction, *id.*, preventing the Department from failing to treat the aforementioned eight programs as professional degrees supports the public interest by ensuring that the agency "faithful[ly] adhere[s] to its statutory mandate." *Id.* (quoting *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977)).

The Court should also issue a declaratory judgment that the Final Rule's definition of professional degree, its exclusion of programs that meet the statutory criteria from that definition, and its limits on the Grandfathering Provision all violate H.R. 1, and that those aspects of the Rule as well as the Secretary's failure to exercise her discretion under section 428H of the HEA are arbitrary and capricious. Such a declaration "will serve a useful purpose in clarifying and settling the legal relations in issue." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).

Declaratory relief is particularly warranted here because Defendants' classification of professional degrees is in a state of uncertainty. The Department's interim guidance, *supra* n.4,

provides that degrees in nursing, athletic training, anesthesiologist assistance, speech-language pathology, audiology, physician assistance, physical therapy, and occupational therapy are, for the moment, professional degrees (as are degrees in other fields). Because the interim guidance applies only "for the duration of the Court's stay," however, Plaintiff States cannot be certain that those programs will continue to be classified as professional degrees in the future. A declaration that—based on the Department's *own* findings in the Final Rule—those programs satisfy the statutory criteria will provide certainty to the parties and enable Plaintiff States' institutions to make hiring decisions and structure their academic programs for future academic years. *See Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998) (a declaratory judgment may be warranted when it "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding") (quoting *Quarles*, 92 F.2d at 325).

Plaintiff States therefore seek a declaration that (a) the Final Rule's definition of professional degree and its limits on the Grandfathering Provision violate H.R. 1; (b) those aspects of the Rule and the Secretary's failure to exercise her discretion under section 428H of the HEA are arbitrary and capricious; (c) based on the Department's findings, it is unlawful to exclude from 20 U.S.C. § 1087e(a)(4)(C)(ii)'s definition of "professional degree" post-baccalaureate programs in nursing, athletic training, anesthesiologist assistance, speech-language pathology, audiology, physician assistance, physical therapy, and occupational therapy; and (d) it is unlawful to exclude from H.R. 1's Grandfathering Provision students who withdraw and re-enroll in the same program of study, or who transfer institutions or degree programs within the same program of study.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant their motion for summary judgment and award relief as set forth in the accompanying proposed order.

Dated: August 26, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (D. Md. Bar. No. 31543)
*Assistant Attorney General*
Michael Drezner (D. Md. Bar. No. 31784)
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6960
kjamieson@oag.maryland.gov

*Counsel for the State of Maryland*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Jessica Ranucci*
Jessica Ranucci*
*Special Counsel*
Victoria Ochoa*
Shanna Tallarico*
*Assistant Attorneys General*
28 Liberty St.
New York, NY 10005
(929) 736-3392
jessica.ranucci@ag.ny.gov

*Counsel for the State of New York*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Martha U. Fulford*
Martha Upton Fulford*
*Assistant Deputy Attorney General*
Erin Farinelli*
Sam Wolter*
*Assistant Attorneys General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
martha.fulford@coag.gov

*Counsel for the State of Colorado*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By */s/ William Y. Durbin*
William Y. Durbin*
*Senior Litigation Counsel*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Caroline E. Wilson*
Caroline E. Wilson*
Daniel A. Osborn*
*Deputy Attorneys General*
Nicklas A. Akers
*Senior Assistant Attorney General*

(602) 542-3333
William.Durbin@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

Bernard A. Eskandari
*Supervising Deputy Attorney General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Callie.Wilson@doj.ca.gov
Daniel.Osborn@doj.ca.gov

*Counsel for the People of the State of California*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: /s/ Mary Lenehan
Mary Lenehan*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Mary.Lenehan@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: /s/ Vanessa L. Kassab
Vanessa L. Kassab*
*Deputy Attorney General*
Anuradha Sivaram*
*Special Assistant Attorney General*
Ian R. Liston
*Director of Impact Litigation*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

By: /s/ Eliza H. Simon
Eliza H. Simon (D. Md. Bar No. 19648)
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, N.W., 9th Floor
Washington, D.C. 20001
(202) 741-5221
Eliza.Simon@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: /s/ Kalikoʻonālani D. Fernandes
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
david.d.day@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Aleeza Strubel*
Aleeza Strubel*
*Complex Litigation Counsel*
Margaret McWhorter*
*Student Loan Ombuds*
Lilia De La Torre*
*Supervising Attorney*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (773) 519-3000
Aleeza.Strubel@ilag.gov
Margaret.McWhorter@ilag.gov
Lilia.Delatorre@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

By: */s/ S. Travis Mayo*
S. Travis Mayo*
*General Counsel*
Sam Flynn
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: (207) 626-8455
Fax: (207) 287-3145
Kate.Thompson@maine.gov

*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Laila M. Ameri*
Laila M. Ameri*
*Assistant Attorney General*
Nita Klunder*
*State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
Laila.Ameri@mass.gov
Nita.Klunder@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Daniel Ping*
Daniel Ping*
Neil Giovanatti*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Adam Welle*
Adam Welle*
*Assistant Attorney General*

*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 241-1050
PingD@michigan.gov
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1425
Adam.Welle@ag.state.mn.us

*Counsel for the State of Minnesota*

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

/s/ Bryce K. Hurst
Bryce K. Hurst*
Lauren E. Van Driesen
*Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4562
Bryce.Hurst@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Justin McCarthy*
Justin McCarthy*
*Assistant Solicitor General*
Olivia den Dulk**
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-7741
jmccarthy@nmdoj.gov
odendulk@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By */s/ Daniel T. Wilkes*
Daniel T. Wilkes*
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6415
dwilkes@ncdoj.gov

*Counsel for the State of North Carolina*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s/ Leanne Hartmann*
Leanne Hartmann*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Leanne.Hartmann@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Michael J. Fischer*
Michael J. Fischer**
*Executive Deputy General Counsel*
Jennifer Selber
*General Counsel*
Governor's Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Jordan Broadbent*
Jordan Broadbent*
*Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
Jbroadbent@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Samuel B. Stratton*
Samuel B. Stratton*
*Assistant Attorney General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
sam.stratton@vermont.gov

*Counsel for the State of Vermont*

**JAY JONES**
ATTORNEY GENERAL OF VIRGINIA

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge**
*Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 786-2071
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ Aaron J. Fickes*
Aaron J. Fickes*
*Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-287-4176
aaron.fickes@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Faye Hipsman*
Faye Hipsman**
*Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707
(608) 957-5218 (phone)
(608) 294-2907 (fax)
Faye.Hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

* *Admitted pro hac vice*
** *Pro hac vice application forthcoming*