**THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>*Defendants*. | No. 1:26-cv-1957-ABA |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE,CROSS-MOTION FOR SUMMARY AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 2

The Working Families Tax Cuts Act ..... 2

Interim Exception to New Loan Limits ..... 3

Reimagining and Improving Student Education ..... 4

Post-Issuance Developments ..... 7

This Litigation ..... 9

LEGAL STANDARD ..... 9

ARGUMENT ..... 10

I. Plaintiffs Lack Standing ..... 10

II. The Rule's Definition of Professional Degree Does Not Violate the APA ..... 14

A. The Definition Is Not Contrary To Law. ..... 14

B. The Definition of Professional Degree Is Not Arbitrary or Capricious. ..... 19

III. The Department's Implementation of the Interim Exception is Lawful. ..... 22

IV. The Department's Implementation of the Interim Exception is Not Arbitrary and Capricious ..... 26

V. Any Relief Should Be Appropriately Limited. ..... 30

A. Plaintiffs Are Not Entitled To a Permanent Injunction ..... 30

B. Plaintiffs Should Not Receive Declaratory Relief ..... 32

C. Any Relief Should Be Limited to the Plaintiffs With Standing and the Relevant Portions of the Rule. ..... 33

CONCLUSION ..... 33

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .......... 31

*Am. Ass'n of Nurse Pracs. v. McMahon*,
836 F. Supp. 3d 175 (D.D.C. 2026).......... 7, 8, 31, 32

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
796 F. Supp. 3d 66 (D. Md. 2025).......... 31, 32

*Am. Nurses Ass'n v. U.S. Dep't of Educ.*,
— F. Supp. 3d —, 2026 WL 2294606 (D. Mass. Aug. 10, 2026).......... 8

*Bragdon v. Abott*,
524 U.S. 624 (1998) .......... 17

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026).......... 27

*Chevron U.S.A. Inc. v. Apex Oil Co., Inc.*,
113 F. Supp. 3d 807 (D. Md. 2015).......... 32

*Circuit City Stores v. Adams*,
532 U.S. 105 (2001) .......... 15

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 12, 13

*ClearOne Advantage, LLC v. Kersen*,
756 F. Supp. 3d 30 (D. Md. 2024).......... 30

*Davis v. Thompson*,
367 F. Supp. 2d 792 (D. Md. 2005).......... 9

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... 27

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 20

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 15, 16, 19

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................ 12

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
681 F.3d 581 (4th Cir. 2012) ........................................ 20

*George v. McDonough*,
596 U.S. 740 (2022) ........................................ 21

*Gill v. Whitford*,
585 U.S. 48 (2018) ........................................ 33

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995) ........................................ 14

*Holbrook v. Tenn. Valley Auth.*,
48 F.4th 282 (4th Cir. 2022) ........................................ 22

*Kravitz v. U.S. Dep't of Com.*,
366 F. Supp. 3d 681 (D. Md. 2019) ........................................ 30

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................ 22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................ 18, 19, 27

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................ 10, 12, 13

*Lynch v. Jackson*,
853 F.3d 116 (4th Cir. 2017) ........................................ 22

*Maryland v. USDA*,
151 F.4th 197 (4th Cir. 2025) ........................................ 11, 12

*Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
173 F.4th 128 (4th Cir. 2026) ........................................ 18, 19

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) ........................................ 19

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 29

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 10, 12

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) .......... 16

*Noble Energy, Inc. v. Salazar*,
671 F.3d 1241 (D.C. Cir. 2012) .......... 31

*Pereira v. Sessions*,
585 U.S. 198 (2018) .......... 27

*Robb Evans & Assocs., LLC v. Holibaugh*,
609 F.3d 359 (4th Cir. 2010) .......... 9

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) .......... 30

*Sekhar v. United States*,
570 U.S. 729 (2013) .......... 17, 21

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) .......... 12

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
528 F.3d 310 (4th Cir. 2008) .......... 22

*Taylor v. U.S. Dep't of Educ.*,
No. CV GLR-26-402, 2026 WL 2209704 (D. Md. July 31, 2026) .......... 9

*Trinity Servs., Inc. v. Marshall*,
593 F.2d 1250 (D.C. Cir. 1978) .......... 15

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 32, 33

*United States v. Helton*,
944 F.3d 198 (4th Cir. 2019) .......... 15

*United States v. Philip Morris USA, Inc.*,
396 F.3d 1190 (D.C. Cir. 2005) .......... 14, 15

*United States v. Texas*,
599 U.S. 670 (2023) .......... 11, 33

*Velasco v. Gov't of Indonesia*,
370 F.3d 392 (4th Cir. 2004) .......... 9

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 10

*Washington v. U.S. Food & Drug Admin.*,
108 F.4th 1163 (9th Cir. 2024) .......... 11

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) .......... 18

*Yates v. United States*,
574 U.S. 528 (2015) .......... 14

**STATUTES**

5 U.S.C. § 701(a)(2) .......... 22

18 U.S.C. § 1964(a) .......... 14

20 U.S.C. § 1001(a)(3) .......... 29

20 U.S.C. § 1078-8 .......... 21, 22

20 U.S.C. § 1082 .......... 1, 19

20 U.S.C. § 1087e .......... *passim*

20 U.S.C. § 1221e-3 .......... 1, 18, 19

20 U.S.C. § 3441 .......... 1, 19

20 U.S.C. § 3471 .......... 1, 19

20 U.S.C. § 3474 .......... 1, 18, 19

Higher Education Act of 1965,
Pub. L. No. 89-329, 79 Stat. 1219 (1965) .......... 1

Working Families Tax Cuts Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025) .......... 1, 2

**RULES**

Fed. R. Civ. P. 56 .......... 9

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 119-206 (2025) ........ 31

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

34 C.F.R. § 668.2 ........ *passim*

34 C.F.R. § 668.22 ........ 26, 29

34 C.F.R. § 685.200 ........ 6

34 C.F.R. § 685.203 ........ 2, 6, 28

34 C.F.R. § 685.214 ........ 26

Federal Student Aid Programs,
72 Fed. Reg. 44620 (Aug. 8, 2007) ........ 16, 20

Reimagining and Improving Student Education,
91 Fed. Reg. 4254 (Jan. 30, 2026) ........ *passim*

Reimagining and Improving Student Education—Federal Student Loan Program Final Requirements,
91 Fed. Reg. 23768 (May 1, 2026) ........ *passim*

**OTHER AUTHORITIES**

*About IPEDS*, NCES,
https://nces.ed.gov/ipeds/about-ipeds (last visited June 16, 2026) ........ 16

Dear Colleague Letter GEN-08-04 (April 14, 2008),
https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf ........ 2

*IPEDS 2025-26 Data Collection System*, NCES, U.S. Dep't of Educ.,
https://surveys.nces.ed.gov/ipeds/public/glossary (last visited June 16, 2026) ........ 16

Kenneth A. Simon & W. Vance Grant, NCES, *Digest of Education Statistics 1970*,
https://babel.hathitrust.org/cgi/pt?id=uiug.30112026512035&seq=7 ........ 20

NCES, U.S. Dep't of Educ., NCES 2008-159, *Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred: 2006-07, and 12-Month Enrollment: 2006-2007* (Oct. 2008),
https://nces.ed.gov/pubs2008/2008159rev.pdf ........ 16, 17

*The Classification of Instructional Programs*, NCES, U.S. Dep't Educ., https://nces.ed.gov/ipeds/cipcode/default.aspx?y=56 (last visited June 3, 2026) .................... 18

## INTRODUCTION

The cost of higher education has risen dramatically over the past several decades, leaving millions of Americans burdened by substantial student debt. Concerned with the unsustainable strain on students, taxpayers, and the federal lending system, Congress enacted, and President Trump signed into law, the Working Families Tax Cuts Act ("WFTCA" or "H.R. 1") to reform federal student lending and promote affordability in higher education. Among other changes, WFTCA sought to encourage institutions to align educational costs with economic outcomes, curb excessive borrowing, and place federal student aid on a more fiscally sustainable footing. WFTCA amended portions of the Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (1965) ("HEA"), and made significant changes to the federal student aid framework, including by establishing new borrowing limits and restructuring available federal student loan programs. One such change was to establish new borrowing limits for graduate and professional students.

"When Congress passes legislation amending statutory provisions regarding programs administered by an agency, that agency is tasked with implementing those changes in its regulations." Reimagining and Improving Student Education, 91 Fed. Reg. 4254, 4256 (Jan. 30, 2026). Federal student loan programs are administered by the Department of Education ("Department"), and Congress has granted the Secretary of Education broad authority to implement those programs. *See* 20 U.S.C. § 1221e-3; *see also id.* §§ 1082, 3441, 3471, 3474. The Secretary exercised this delegated authority by promulgating a Rule to implement WFTCA's statutory reforms. *See* Reimagining and Improving Student Education—Federal Student Loan Program Final Requirements, 91 Fed. Reg. 23768 (May 1, 2026) ("Rule"). Plaintiffs lack standing for their challenge, necessitating a dismissal for lack of jurisdiction. In the alternative, Defendants are entitled to summary judgment because the Rule correctly interprets the WFTCA. If the Court disagrees, Plaintiffs should not receive permanent injunctive relief or declaratory relief, and any relief should be limited to those Plaintiffs that the Court determines have standing.

## **BACKGROUND**

**The Working Families Tax Cuts Act**

On July 4, 2025, Congress enacted, and President Trump signed into law H.R. 1, colloquially known as the Working Families Tax Cuts Act, or WFTCA. *See* Pub. L. No. 119-21, 139 Stat. 72 (2025). Among other things, WFTCA amended the Department's Direct Loan program to establish loan caps for graduate and professional students and to terminate graduate and professional federal Direct PLUS loans altogether.[1] *See* 20 U.S.C. § 1087e. WFTCA added multiple subparagraphs to the HEA and codified the caps on student loans at 20 U.S.C. § 1087e(a)(4). *See* Pub. L. No. 119-21, § 81001, 139 Stat. at 334–35. That provision caps borrowing by "a graduate student, who is not a professional student" to $20,500 for "any academic year or its equivalent." 20 U.S.C. § 1087e(a)(4)(A)(i). By contrast, the maximum annual amount that "a professional student may borrow in any academic year or its equivalent [is] $50,000." *Id.* § 1087e(a)(4)(A)(ii).

Congress also established new aggregate limits for both graduate and professional students, with professional students qualifying for a higher cap. The aggregate limit for a graduate student "who is not (and has not been) a professional student," is $100,000. *Id.* § 1087e(a)(4)(B)(i)(I). And if a graduate student "is (or has been) a professional student," the maximum is $200,000 minus the amount borrowed for the student's professional program. *Id.* § 1087e(a)(4)(B)(i)(II). For a professional student "who is not (and has not been) a graduate student," WFTCA establishes a $200,000 aggregate cap. *Id.* § 1087e(a)(4)(B)(ii)(I). And the aggregate cap for a professional student "who is (or has been) a graduate student," is $200,000 minus the amount borrowed for the

[1] Prior to July 4, 2025, graduate and professional students could obtain Direct Unsubsidized Loans up to $20,500 per year ($138,500 in aggregate). *See* 34 C.F.R. § 685.203 (2025); *see also* NPRM at 4273 (comparison chart). Additionally, graduate and professional students enrolled in certain approved health profession programs could obtain Direct Unsubsidized Loans of up to $224,000 in aggregate. *See* NPRM at 4277; Dear Colleague Letter GEN-08-04 (April 14, 2008), https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf.
Graduate and professional students in need of additional federal financial assistance could then obtain Direct PLUS loans (also known as Grad PLUS loans), available at a higher interest rate than Direct Unsubsidized Loans, to cover up to the full cost of attendance.

student's graduate program. *Id.* § 1087e(a)(4)(B)(ii)(II). All loan limits "begin[] on July 1, 2026," *id.* § 1087e(a)(4)(A), (B), unless the interim exception explained below applies.

WFTCA effectuated the distinct loan caps for graduate students and professional students by defining those terms. A "graduate student" is "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *Id.* § 1087e(a)(4)(C)(i). And "in this paragraph,"—*i.e.*, for purposes of the annual and lifetime loan caps—a "professional student" "means a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on [the date of enactment of this paragraph]), upon completion of the program." *Id.* § 1087e(a)(4)(C)(ii). In short, Congress's definition of professional student depends on the degree the student is seeking. And for the requisite degrees, Congress relied on a defined term in the Code of Federal Regulations at 34 C.F.R. § 668.2.

As of the date of WFTCA's enactment, § 668.2 defined a professional degree as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2.

**Interim Exception to New Loan Limits**

Section 1087e(a)(8) of the WFTCA also established an interim exception to the new federal student-loan limits for certain borrowers. The provision is sometimes referred to as the "grandfathering provision" because it permits qualifying borrowers to continue borrowing under the prior loan limits during the expected time to complete their program. Under the interim exception, the new limits do not apply "during the expected time to credential described in

subparagraph (B), with respect to an individual who, as of June 30, 2026—(i) is enrolled in a program of study at an institution of higher education; and (ii) has received a loan (or on whose behalf a loan was made) under this part for such program of study." 20 U.S.C. § 1087e(a)(8)(A). In subparagraph (B), the statute defines the "expected time to credential" by reference to the length of the program of study in which the student "is enrolled" and the portion of that program the individual "has completed" as of June 30, 2026. *Id.* § 1087e(a)(8)(B). Specifically, the expected time to credential is "the lesser of—(i) three academic years; or (ii) the period determined by calculating the difference between—(I) the program length for the program of study in which the individual is enrolled; and (II) the period of such program of study that such individual has completed as of the date of the determination under this subparagraph." *Id*. The statute further defines "program length" by reference to the minimum amount of time specified by an institution "for a full-time student to complete the requirements for a specific program of study." *Id*. § 1087e(a)(8)(C).

**Reimagining and Improving Student Education**

To implement WFTCA's changes, the Department published a Notice of Proposed Rulemaking titled Reimagining and Improving Student Education. 91 Fed. Reg. 4254, 4254 (Jan. 30, 2026) ("NPRM"). The NPRM explained that the Department had convened a negotiated rulemaking committee in the fall of 2025 and that the committee had "reached consensus" on proposed new regulatory text to be codified in title 34 of the Code of Federal Regulations. NPRM at 4256. The Department noted in the NPRM that WFTCA's definition of professional student "incorporated a variety of words and phrases that may, without context, appear ambiguous or vague on their face or as applied to specific degree programs." *Id.* at 4262. The Department's proposed definition set forth "the best reading of [WFTCA] using the tools of statutory construction." *Id.*

On the WFTCA's definition of professional degree, the Department acknowledged that the WFTCA definition "establishes a three-part test" for a professional degree. *Id.* Those three requirements were included in the new proposed regulation as separate criteria. *See id.* at 4332.

As for the specific degrees enumerated in § 668.2, the Department needed no "additional interpretive work" to know that they are professional degrees. *Id.* at 4262. Accordingly, the Department listed those degrees in a separate subsection, as fields where "[a] professional degree may be awarded." *Id.* at 4332. The Department proposed adding the Doctorate of Clinical Psychology to that list because it meets all the criteria derived from WFTCA's three-part tes. *See id.* at 4263.

The rest of the Department's proposed criteria stemmed from the illustrative list of degrees in 34 C.F.R. § 668.2. The Department determined that the § 668.2 list "provides additional contextual clues" that assist in "discerning the facial or as applied meaning of the operative test." *Id.* at 4262. Specifically, the Department explained that the illustrative list "suggests that" a degree "must *generally* be at the doctoral level," since the list contains only three non-doctoral degrees. *Id.* (emphasis added). The Department further explained that § 668.2's definition was based on a previous definition of "first-professional degree" in a glossary of terms that the Department published to schools for data reporting. *See id.* That old glossary definition required a "first-professional degree" to include "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." *Id.* This glossary had listed as "first-professional degrees" the same ten degrees enumerated in § 668.2. Accordingly, the Department proposed that a professional degree must "generally be at the doctoral-level" and must require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." *Id.* at 4262, 4332.

Lastly, the Department proposed as a criterion that a degree must have "a four-digit program CIP code . . . in the same intermediate group as" the degrees enumerated in § 668.2 and clinical psychology. *Id.* at 4332. CIP refers to the Classification of Instructional Programs ("CIP"), a system designed "for tracking and reporting fields of study and program completion activity." *Id.* at 4264. Requiring the same four-digit codes as the § 668.2 degrees and clinical psychology would encompass any degrees "closely related" to the ones enumerated in the new

regulation. *Id.* The NPRM's discussion of the definition of professional degree ended with discussion of specific degrees and why the Department concluded that those degrees did not "meet the professional degree definition." *Id.* at 4265–67.

To conform with WFTCA's interim exception to the new loan limits, the Department also proposed regulations at §§ 685.200 and 685.203, which allow "a borrower who is enrolled in a program of study and who has participated in the Direct Loan Program to continue to participate in the program on the same terms until they complete their degree or withdraw." NPRM at 4267. As the Department explained, these "grandfathering provisions do not apply to any student who withdraws, even if they subsequently reenroll in the same program." *Id.*

The Department requested comments by March 2, 2026. *See id.* at 4254. On May 1, the Department published a final rule. *See* Rule. The preamble responded to numerous comments about the proposed definition of "professional student." As in the NPRM, the Department stated that the list of degrees in § 668.2 "provides context and limiting principles" about whether other degrees qualify as professional degrees. *Id.* at 23783. The Department relied on that list "to identify common characteristics of those degrees" and included those common characteristics as criteria in the Rule. *Id.* at 23785. As proposed, the Department determined that clinical psychology is a professional degree. *See id.* at 23782. The preamble further responded to comments about specific degrees, including some at issue in this litigation, and explained why each degree did not qualify as a professional degree. *See id.* at 23790–808.

Ultimately, the Rule promulgates the following regulatory text related to the definition of a professional degree:

> (i) A professional degree is a degree that:
>
> > (A) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
> >
> > (B) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;

> (C) Generally requires professional licensure to begin practice; and
>
> (D) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (ii)(A) of this definition.
>
> (ii) A professional degree may be awarded in the following fields:
>
> (A) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

*Id.* at 23882.

The Rule adopted the Department's proposed regulations implementing the interim exception. *See id.* at 23883–84. The Rule provides that to qualify for the interim exception, a student must be "enrolled in a program of study at an institution as of June 30, 2026" and a Direct Loan must have been "made for such program of study prior to July 1, 2026." *Id.* at 23812. The Rule gives effect to the text of the interim exception by treating continued enrollment in the qualifying program as necessary to continued application of the interim exception. The Department clarified that "[a] borrower who officially withdraws or otherwise ceases to be enrolled would lose continued eligibility under the interim exception," *id.* at 23813, which includes transfer students who enroll in "a new program of study," *see, e.g.*, *id.* at 23814, 23821.

The Department also noted in the preamble that all portions of the Rule are severable and established the Department's "inten[t] that [the portion of the Rule regarding classification of degrees as professional degrees] is entirely severable" from the rest of the Rule. *Id.* at 23771. The Rule took effect on July 1, 2026. *See id.* at 23768.

**Post-Issuance Developments**

Shortly before the Rule went into effect, a court in the District of Columbia ("D.C. court") on June 24, 2026, issued a stay under section 705 of the APA of part of the Rule's definition of professional degree. *See Am. Ass'n of Nurse Pracs. ("AANP") v. McMahon*, 836 F. Supp. 3d 175,

(D.D.C. 2026). The D.C. court concluded that, as a preliminary matter, the plaintiffs were likely to show that the Department "lacked the authority to make the[] material changes to Congress's required definition," specifically the "'contextual' set of factors" that the court viewed the Department as having "add[ed] to the three-part test" in the text of § 668.3, as it related to certain nursing and physician assistant degrees. *Id.* at 203. The D.C. court accordingly stayed part (i) of the Rule's definition of professional degree (the part promulgating the contextual factors as a matter of regulatory text) and the "free-from-supervision requirement in the preamble to the Rule." *Id.* at 210. But the D.C. court noted that its stay decision did "not change the validity or force of the statutory definition," *id.* at 211, and denied a request from some plaintiffs to direct the Department to treat specific degrees as professional, *see id.* at 212–13. The D.C. court left that determination to the Department in the first instance. *See id.*

Five days later, the Department released an Electronic Announcement in response to the D.C. court's stay, noting the Department's confidence in the lawfulness of the Rule. *See* Ex. 1 at 2.[2] "[T]o facilitate implementation of the [D.C.] [c]ourt's order," the Electronic Announcement listed programs that the Department would treat "as awarding professional degrees" for the duration of the D.C. court's stay, *id.* at 2–3, and programs the Department would not treat as awarding professional degrees for the same duration, *see id.* at 4. The Department released an updated Electronic Announcement on July 10. *See* Ex. 2. On August 10, 2026, the District Court for the District of Massachusetts denied preliminary relief in another challenge seeking a stay or preliminary injunction against the definition of professional degree. *See Am. Nurses Ass'n v. U.S. Dep't of Educ.*, — F. Supp. 3d —, 2026 WL 2294606 (D. Mass. Aug. 10, 2026). Those lawsuits are still ongoing, as are two suits other than this one. *See Ass'n of Accredited Naturopathic Med. Colls., et al. v. McMahon, et al.*, No. 3:26-cv-1599 (D. Or. July 31, 2026); *Am. Fed'n of Lab. and Cong. of Indus. Orgs., et al. v. U.S. Dep't of Educ., et al.*, No. 1:26-cv-2833 (D.D.C. August 11, 2026).

[2] All pincites to filings in this case are to the ECF pagination.

**This Litigation**

Plaintiffs are twenty-five States and the District of Columbia who filed suit on May 19, 2026, against the Department of Education and Secretary McMahon in her official capacity. *See* Compl., ECF No. 1. Counts I and II assert that the definition of professional degree is contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"). *See id.* ¶¶ 183–97. Counts III and IV make the same assertions as to the Rule's implementation of the interim exception. *See id.* ¶¶ 198–212. After the Department produced the administrative record, Plaintiffs moved for summary judgment on their claims. *See* ECF Nos. 95, 95-1 ("Pls.' MSJ").

## LEGAL STANDARD

"A motion to dismiss based on lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) raises the question of whether the court has the competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "The burden of establishing subject matter jurisdiction is on . . . the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010). "Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For APA claims, "the standard set forth in Rule 56 'does not apply because of the limited role of a court reviewing the administrative record.'" *Taylor v. U.S. Dep't of Educ.*, No. CV GLR26-402, 2026 WL 2209704, at *3 (D. Md. July 31, 2026) (citation omitted). In APA cases, "the district court sits as an appellate tribunal to decide as a matter of law whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id.* (citation modified).

## ARGUMENT

Plaintiffs' claims fail. First and foremost, they lack Article III standing. Even if they have standing, the Rule's definition of professional degree is consistent with Congress's decision in the WFTCA to incorporate the definition in 34 C.F.R. § 668.2. The Department also implemented the best reading of the interim exception in the Rule, and it is thus not contrary to law or arbitrary and capricious.

### I. Plaintiffs Lack Standing.

Standing is an essential aspect of the Article III case-or-controversy requirement that requires a plaintiff to have "a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). A "plaintiff 'bears the burden of establishing standing as of the time [it] brought the lawsuit and maintaining it thereafter.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). "At the pleading stage, general factual allegations of injury" may suffice; "[i]n response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).

Plaintiffs' theory of standing is that the Rule's definition of professional degree will lead to reduced enrollment "in state universities' post-baccalaureate programs," reducing Plaintiff States' revenue. Pls.' MSJ at 17. As Plaintiffs tell it, prospective students will not enroll due to the need to "obtain private loans." *Id.* at 13. This will cause a host of problems, Plaintiffs say. Lower enrollment in these programs leads to fewer people with the necessary credentials "to serve as faculty and clinical supervisors" for future students. *Id.* And because those prospective students will have more expensive debt, they will pursue private-sector jobs rather than academia. *See id.* This will allegedly exacerbate faculty shortages—thereby decreasing enrollment even further due to lack of faculty—and the shortage of health care practitioners more generally in Plaintiff States. *See id.* at 13–14. Due to those shortages, Plaintiffs will need "to devote more tax money" to employ practitioners. *Id.* at 14. Plaintiffs' theory as to the grandfathering provisions is the same:

reduced enrollment in post-baccalaureate programs from "new barriers to transfer and reennrollment." *Id.*

The problems with Plaintiffs' standing theories are legion. To begin, the monetary effects on state budgets alleged here are too far removed to create an injury in fact. A State's "claim for standing can become more attenuated" when its assertion of injury relies on the "indirect effects on state revenues or state spending" generated by federal action. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). Relying on that concept, the Supreme Court has held that a group of States lacked standing to challenge federal immigration policies when the only assertion of injury was that the federal policies would "impose[] costs on the States" in the form of increased "social services such as healthcare and education to" additional persons. *Id.* at 674; *see also id.* at 680 n.3. The Fourth Circuit has followed suit, holding last year that a group of States lacked standing to challenge federal agencies' decision to fire employees because "[i]nnumerable federal actions impact state budgets and programs. *Maryland v. USDA*, 151 F.4th 197, 210 (4th Cir. 2025). Supposed "declines in tax revenue and increased social services expenses" did not confer standing because, "[i]f states could claim these peripheral costs for purposes of standing, there would effectively be no barrier to suit." *Id.* (quotation marks omitted).

Plaintiffs' allegations here are similarly deficient. Plaintiffs speculate that the Rule will "decrease the supply" of new faculty and that they will need "to devote more tax money to employ healthcare practitioners." Pls.' MSJ at 13–14. These are the same kinds of "increased social services expenses" that the Fourth Circuit held could not confer standing. *Maryland*, 151 F.4th at 210; *see also Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1176 (9th Cir. 2024) (rejecting a theory of State standing based on "an alleged uptick in Medicaid costs" as a "boundless conception of Article III's injury requirement"). And Plaintiffs' predictions of lost revenue likewise are as indirect as the "declines in tax revenue" that were inadequate in *Maryland*, 151 F.4th at 210; *see also* Pls.' MSJ at 14 (asserting that restrictions on transfers and withdrawals will "diminish[]" Plaintiffs' revenue). Indeed, the Rule regulates loans received by students and disbursed by universities, "none of whom are even parties to this suit." *Maryland*. 151 F.4th at

210; *see* Pls.' MSJ at 14 (arguing that Rule's provisions on grandfathering "will reduce *students'* flexibility and disrupt *universities'* programs" (emphasis added)). Plaintiffs "may not masquerade their efforts to serve as *parens patriae*." *Maryland*, 151 F.4th at 210 (citing *Murthy*, 603 U.S. at 76). And there is no doubt Plaintiffs are doing so—they admittedly seek relief on behalf of "private" institutions within their borders, Pls.' MSJ at 34 n.7, even though such institutions are readily capable of bringing suit themselves and have not done so.

Even if the Court disagrees, there are multiple other issues, notably the chain of possibilities proffered by Plaintiffs. Most glaringly, Plaintiffs' assertions of harm assume that "fewer students" will enroll in programs at institutions in Plaintiff States because of the Rule's definition of professional degree, Pls.' MSJ at 13; *see also id.* (asserting injury from "lowering nationwide enrollment"), or because of the Rule's "restrictions on grandfathering," *id.* at 14. In other words, Plaintiffs' injuries depend at bottom on the conduct of thousands of third parties not before the court. *See Lujan*, 504 U.S. at 560; *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976); *Murthy*, 603 U.S. at 57; *contra* Pls.' MSJ at 17.

And that conduct is not sufficiently predictable to establish standing. Whether any student chooses not to enroll in a particular education program depends on a host of speculative contingencies that cannot establish the kind of "certainly impending" injury necessary to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs."). Plaintiffs' theory also assumes that other entities will not offer alternative sources of funding. But the Rule notes that "borrowers may have access to different funding options, that may include institutional loans, scholarships, non-Federal funding sources, or additional institutional aid drawn down from endowments." Rule at 23817. Institutions are already lowering tuition and offering additional student aid, *see id.* at 23849 n.47 (citing examples), and Plaintiffs cannot assume that such effects will not happen in the future.

Even if Plaintiffs are correct that fewer students will enroll, the rest of their injuries constitute a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414. Plaintiffs simply speculate that students will pursue fewer careers in academia and, even if not in academia, will not practice post-graduation in States suffering from a "shortage of healthcare practitioners." Pls.' MSJ at 13. Plaintiffs provide no support for these assertions. Their declarations are all from administrators who, for all their experience, cannot offer the necessary "specific facts" about how the Rule will influence the actions of prospective students, either pre- or post-enrollment, including whether they will or will not pursue academic careers. *Lujan*, 504 U.S. at 561.

Plaintiffs' challenge also fails the traceability and redressability requirements for standing. Even if the Court were to vacate the definition of professional degree and/or the grandfathering provisions of the Rule, prospective students would still face the loan limits put in place by WFTCA and the elimination of Grad PLUS loans. In other words, prospective students might still need to "obtain private loans," not because of the Rule, but because Congress enacted loan limits in WFTCA. Pls.' MSJ at 13. Based on Plaintiffs' theory, all their injuries would follow: lower enrollment due to lower loan limits, fewer students pursuing academia, fewer students available to be hired as faculty, and fewer health care practitioners in general.[3] *See* Pls.' MSJ at 13–14. In short, Plaintiffs' theory as articulated here suggests that their injuries will occur even if this Court vacates portions of the Rule or directs the Department to treat certain programs as professional. Plaintiffs' requested remedy therefore does not redress their asserted injuries, and they thus lack standing for that reason as well.

Because Plaintiffs lack standing, the Court should dismiss their complaint for lack of jurisdiction. If the Court disagrees, Defendants are entitled to summary judgment for all the reasons given below.

---

[3] Any asserted injury stemming from a shortage of health care practitioners, *see* Pls.' MSJ at 13–14, is particularly suspect because Plaintiffs admit that those shortages predate the Rule. *See* Pls.' MSJ at 13–14 (describing shortage of physician assistants and nurses in D.C.). Similarly, Plaintiffs say they have "already" faced faculty shortages that vacating the Rule will not remedy. *Id.* at 13.

## II. The Rule's Definition of Professional Degree Does Not Violate the APA.

### A. The Definition Is Not Contrary To Law.

Each component of the Department's definition of professional degree accords with the language in 34 C.F.R. § 668.2 that Congress cross-referenced in WFTCA. The Department must respect that Congress chose to define professional degree based on the illustrative list in § 668.2.

The Department's interpretation of professional degree flows naturally from the statutory principle of *noscitur a sociis*, which holds that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). This canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation omitted). That canon requires the Department to interpret "professional degree" based on the words surrounding it—namely, the list of degrees already in § 668.2. That list provides context for the degrees that Congress wanted to designate as professional. *See* NPRM at 4263.

True enough, that list provides "[e]xamples" which "include but are not limited to" the enumerated degrees. 34 C.F.R. § 668.2; *see also* Pls.' MSJ at 18–19. But the illustrative list still has meaning for what is a professional degree. "The words 'including, but not limited to' introduce a non-exhaustive list that sets out specific examples of a general principle." *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005). In *Philip Morris*, the D.C. Circuit interpreted a statute that allowed district courts to enforce a criminal law "by issuing appropriate order, including but not limited to" a list of specific types of orders. *Id.*; *see also* 18 U.S.C. § 1964(a). The court held that it could not order disgorgement under that statute because the listed remedies were "to prevent future violations," and disgorgement is "a very different type of remedy aimed at separating the criminal from his *prior* ill-gotten gains." *Philip Morris*, 396 F.3d at 1200. In the same way, the Department can "expand on the [degrees] explicitly included in [§ 668.2] only with [degrees] similar in nature to those enumerated." *Id.* The Department thus properly

interpreted "professional degree" to include only degrees like those degrees in the list. *See* Rule at 23785.[4]

That interpretation also stems from the related canon of *ejusdem generis*, which teaches that "where specific words precede or follow general words in an enumeration . . . the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words." *Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250, 1258 (D.C. Cir. 1978). Here, the general term "professional degree" should be interpreted by reference to and in light of common attributes shared by the specific degrees listed in § 668.2. *See Circuit City Stores v. Adams*, 532 U.S. 105, 114 (2001) (applying *ejusdem generis* to "give independent effect to the statute's enumeration of . . . specific categories," which would otherwise be superfluous).

Plaintiffs respond that "neither of those canons apply because the statute is clear." Pls.' MSJ at 21. This argument severely overstates the clarity of § 668.2, which defines a professional degree with reference to "a given profession," 34 C.F.R. § 668.2, without defining "profession" or indicating (absent the illustrative list) what qualifies as a "profession." For example, whether a degree that "signifies [] completion of the academic requirement for beginning practice in a given profession," *id.*, includes only the entry-level degree or any degree that can be used to gain entry into a "profession" is unclear. *Id*. Similarly, § 668.2 "generally" requires professional licensure without explaining what level of generality is needed. *Id*. The language in Section 668.2 is not "coherent and consistent," as Plaintiffs suggest. Pls.' MSJ at 21 (citation omitted).

The Department therefore needed to use statutory canons to determine § 668.2's meaning. Those canons require the Department to rely on the illustrative list of degrees; another approach would disregard Congress's choice to incorporate the entire list of degrees in § 668.2. *See Fischer*

[4] Nothing about this argument contradicts that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *United States v. Helton*, 944 F.3d 198, 206 (4th Cir. 2019) (citation omitted) (cited at Mot. 18–19). Presuming that Congress meant to include more degrees than the ones in the illustrative list—which the Department explicitly did and acknowledged, *see* Rule at 23785—does not mean presuming that Congress meant to include degrees dissimilar from the ones in that list. *See Philip Morris*, 396 F.3d at 1200.

*v. United States*, 603 U.S. 480, 487 (2024) ("Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it."). The Department could not ignore that list which Congress incorporated. And the Department is not "rewrit[ing] Congress's definition" by using the illustrative list in this way. Pls.' MSJ at 21. Indeed, it is Plaintiffs who would require the Department to disregard that list, even though Congress incorporated all of § 668.2 in the WFTCA and the Department must "give effect, if possible, to *every* word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018) (emphasis added) (citation omitted). The Rule's criteria for what constitutes a professional degree flow from that language.

***Requirements in Subsection (i)(B).*** First take the length-of-coursework requirements in in subsection (i)(B) of the Rule. *See* Rule at 23882. Those are common characteristics of the degrees listed in § 668.2 and come from § 668.2's history. As the Department explained when it proposed § 668.2 in 2007, the term "professional degree" is "based on the definition [then] used by the National Center for Educational Statistics (NCES)," which defined the term first-professional degree. Federal Student Aid Programs, 72 Fed. Reg. 44620, 44621 (Aug. 8, 2007); *see also* NPRM at 4262–63 (discussing this history). NCES defined that term for purposes of the Integrated Postsecondary Education Data System ("IPEDS"), "a system of interrelated surveys" that "gathers information from every college, university, and technical and vocational institution that participates in the federal student financial aid programs." *About IPEDS*, NCES, https://nces.ed.gov/ipeds/about-ipeds (last visited Sep. 25, 2026). IPEDS has always provided a glossary of terms to guide institutions in their data collection efforts.[5] In 2007, two of the IPEDS glossary's criteria for "first-professional degree" were that the degree reflects "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." NCES, U.S. Dep't of Educ., NCES 2008-159, *Postsecondary Institutions in the United States: Fall 2007, Degrees and Other Awards Conferred:*

[5] To access the current glossary, *see IPEDS 2025-26 Data Collection System*, NCES, U.S. Dep't of Educ., https://surveys.nces.ed.gov/ipeds/public/glossary (last visited Sep. 25, 2026).

*2006-07, and 12-Month Enrollment: 2006-2007* at B-2 (Oct. 2008).[6] The glossary listed as first-professional degrees the same degrees as in § 668.2. *See id.*

Thus, when the Department promulgated § 668.2 with the same list of professions as the previous IPEDS definition, § 668.2 "br[ought] the old soil" with it, including the length-of-coursework requirement. *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (citation omitted). Congress "inten[ded] to incorporate [that] administrative . . . interpretation[]" when it cross-referenced § 668.2 in WFTCA. *Bragdon v. Abott*, 524 U.S. 624, 645 (1998).

The other requirement in subsection (i)(B) that a professional degree be "generally at the doctoral level" likewise flows from § 668.2. Rule at 23882. "[O]nly one" grouping of those degrees—the ones for Theology—includes only degrees "not at the doctoral level." *Id.* at 23784. That is a major clue; if 90% of the degrees incorporated by Congress are doctoral, "professional degree" encompasses degrees that are "*generally* at the doctoral level." *Id.* at 23882 (emphasis added). Although the Department does not read § 668.2 to "require a doctoral-only rule"—hence the inclusion of the term "generally" in the regulatory text, *id.* at 23784—the identification of almost entirely doctoral degrees indicates that Congress incorporated a definition of "professional degree" that generally includes degrees at the doctoral level. Plaintiffs suggest that the list contains three non-doctoral degrees such that this criterion is "inconsistent with the accompanying terms in the illustrative list." Pls.' MSJ at 21. Plaintiffs apparently would rather define professional degree by a characteristic present in only 10% of the illustrative list. That makes little sense.

***Requirement in subsection (i)(C).*** Plaintiffs suggest that requiring a professional degree to generally require licensure "to begin practice" somehow adds "to the plain statutory definition." Pls.' MSJ at 19 (citation omitted); *see also* Rule at 23882. Not so. Section 668.2 says that for a professional degree, "[p]rofessional licensure is also generally required." 34 C.F.R. § 668.2. To do what? The only possible answer is to practice the profession resulting from a given degree.

[6] This report is available at https://nces.ed.gov/pubs2008/2008159rev.pdf. And although the report postdates the Department's promulgation of § 668.2, the data collection occurred in "fall 2007." *Id.* at iii.

Indeed, § 668.2 identifies degrees needed "for beginning practice." *Id.* The Rule's criterion in subsection (i)(C) thus makes clear what the statute itself says.

***Four-Digit CIP Code Requirement.*** "[E]very postsecondary school that receives Federal student aid funds must use CIP codes to report their program data to the government." NPRM at 4264. CIP codes are arranged in two-digit, four-digit, and six-digit groupings, and there are 48 two-digit CIP codes for a particular area of study.[7] Within each two-digit series is a four-digit code that groups programs "that have comparable content and objectives" within the particular area. *Id.* And "specific instructional programs" receive their own six-digit code. *Id.*

Using four-digit CIP codes ensures that professional degrees remain similar to the degrees listed in § 668.2 and is consistent with the Department's interpretive approach. Since those four-digit codes group programs by "comparable content and objectives," any program that falls into the same four-digit code as a recognized professional degree is a professional degree, assuming it meets all other requirements. *Id.* In contrast, using the two-digit codes would include programs that have only a minimal relationship to the degrees that Congress incorporated in the WFTCA. *See id.* (discussing example of Veterinary Medicine); *see also* Rule at 23786.

Clarifying the professional degree definition using CIP codes also "fill[s] up the details" of the Department's procedures for loan limits. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)); *see also Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 173 F.4th 128, 135 (4th Cir. 2026). Here, multiple statutory provisions authorize the Secretary to prescribe general rules and regulations. *See* 20 U.S.C. §§ 1221e-3, 3474. CIP codes also avoid "confusion among institutions or even [within] the Department regarding what specific programs are eligible for the higher loan limits" given that institutions are already familiar with them. Rule at 23784; *see also id.* at 23788 (noting multiple comments requesting clear criteria).

[7] The Court can peruse the CIP codes by visiting *The Classification of Instructional Programs*, NCES, U.S. Dep't Educ., https://nces.ed.gov/ipeds/cipcode/default.aspx?y=56 (last visited June 3, 2026) and clicking on the dropdown titled "2-digit series."

***Supervision "Requirement."*** Relying on considerations surrounding supervision to identify a professional degree is consistent with Congress's incorporation of § 668.2. Professionals with the degrees listed in § 668.2 (and clinical psychology) "may obtain a license and practice without supervision of another licensed professional." *Id*. at 23787. And although some of the degrees do involve supervision, that supervision is "temporary" and "by someone who holds the same degree and practices the same profession." *Id.* Those characteristics, then, are part of the definition of "professional degree" based on the "common sense" canons of *noscitur a sociis* and *ejusdem generis*. *Fischer*, 603 U.S. at 487.

In sum, the Rule's criteria flow from the statutory text and are correct as a matter of plain language. But even if the Court disagrees, the undefined and broad terms "profession" and "generally" in § 668.2 are "term[s] or phrase[s] that leave[] agencies with flexibility" in how to regulate the WFTCA's student loan caps. *Loper Bright*, 603 U.S. at 395 (citation omitted); *accord Mosaic Co. v. United States*, 160 F.4th 1340, 1347 (Fed. Cir. 2025) (when statute did not define phrase "predominant user," agency had reasonable flexibility to assess who is a "predominant user"). When the best reading of a statute is that it delegates "discretionary authority to an agency," a court must ensure that "the agency has engaged in reasoned decisionmaking within" the boundaries of that delegation. *Milligan*, 173 F.4th at 134 (quoting *Loper Bright*, 603 U.S. at 395); *see also* 20 U.S.C. § 1221e-3; *see also id.* §§ 1082, 3441, 3471, 3474 (delegating authority to Secretary to issue regulations). For all the reasons above, the criteria in the Rule are a reasonable use of the authority delegated to the Department by Congress. And the Department possesses expertise over the details of various postbaccalaureate degrees to which the Court can and should, consistent with the APA, "properly resort for guidance." *Loper Bright*, 603 U.S. at 394 (citation omitted).

**B. The Definition of Professional Degree Is Not Arbitrary or Capricious.**

Plaintiffs assert that the Department's definition of professional degree is arbitrary and capricious in two ways. First, the Department "applied the extraneous factors on which it relied arbitrarily." Pls.' MSJ at 22–25. Second, the Department failed to consider the Secretary's

discretionary authority to increase aggregate loan limits for certain health profession degrees. *See id.* at 25–27. Neither succeeds. A court's review under the arbitrary-and-capricious standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012) (citation omitted). A court also "may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

**1.** Plaintiffs fail to persuasively argue that the Department arbitrarily applied any factors. Start with supervision. The common characteristic is not a "lack-of-supervision," Pls.' MSJ at 23, it a lack of supervision "by a licensed professional in a different occupation," Rule at 23787. The theological degrees share that characteristic. Moreover, the practice of religions is not "license[d], supervise[d], or regulate[d]," NPRM at 4265 n.15, because the First Amendment does not permit it, *see* Rule at 23791. Indeed, the theology degrees are an exception to the statutory requirement that licensure is required, and their inclusion in § 668.2 reflects a respect for long-established treatment of those degrees and recognition of theology as a profession. *See id.* at 23791 & n.10.

The Department also is not "privileg[ing] the views of a minority of States" regarding supervision. Pls.' MSJ at 24. The Department is relying on the enumerated list of degrees to exclude degrees that, in *any* State, are supervised by a professional licensed in another profession. The Department cannot achieve "a clear, nationally uniform framework" requested by all parts of the student-loan system, Rule at 23782, if that framework is a "dynamic classification keyed to a certain numerical cou[n]t of State laws," *id.* at 23787.

Contrary to Plaintiffs' next argument (at 24), the regulatory history of § 668.2 is relevant. Congress incorporated a regulation that is itself "based on" previous definitions and interpretation by the Department. 72 Fed. Reg. at 44621. In fact, Department publications have discussed first-professional degrees since at least 1970. *See* Kenneth A. Simon & W. Vance Grant, NCES, *Digest of Education Statistics 1970* at 2, https://babel.hathitrust.org/cgi/pt?id=uiug.30112026512035&seq=7 (describing "students working toward first-professional degrees"). When Congress transplants language "from another

legal source . . . it brings the old soil with it." *Sekhar*, 570 U.S. at 733 (citation omitted). A regulation and its history can form that old soil, *see George v. McDonough*, 596 U.S. 740, 746 (2022), so it is not "illogical" for the Department to consult that history given Congress incorporated a regulation, Pls.' MSJ at 24.

Plaintiffs also point to the Department's supposed reliance on "degree inflation," *id.*, but they miss the Department's actual decision. The Department excluded physical-therapy degrees because "there are multiple pathways to licensure" in that field, unlike in the fields listed in § 668.2. Rule at 23793. And the Department excluded the Master of Science in Occupational Therapy ("MSOT") and Doctor of Occupational Therapy ("OTD") degrees because those degrees "[are] not specifically required to enter the field" of occupational therapy. NPRM at 4265. Someone may be eligible to sit for the necessary boards "if they have a bachelor's or a master's in a related field." *Id.* The Department therefore did not rely on degree inflation to exclude those degrees, but rather the comparison between them and the ones listed in § 668.2.

**2.** Plaintiffs' arguments about the Secretary's discretionary authority under section 428H of the Higher Education Act (20 U.S.C. § 1078-8) also fail, and they should not receive any relief about that authority. *See* Pls.' MSJ at 25–27; *see also* Proposed Order ¶ 4(b), ECF No. 95-2. The Department correctly concluded that the Secretary cannot exercise that discretion as to these loans post-WFTCA. *See* Rule at 23818. Section 1087e(a)(1) requires loans to have the "same terms, conditions, and benefits" as loans disbursed in 2010—including under section 428H—"[u]nless otherwise specified in this part." 20 U.S.C. § 1087e(a)(1). Congress "otherwise specified" in WFTCA by establishing the new caps for Direct Loans. *Id.*; *see also id.* § 1087e(a)(4). WFTCA therefore overrides the Secretary's authority under § 1078-8 to set higher loan limits for loans "in certain approved health profession programs . . . made on or after July 1, 2026." Rule at 23818; *contra* Pls.' MSJ at 26. Plaintiffs' contrary arguments misread the statute.[8]

[8] The Rule does "address cost of attendance." Pls.' MSJ at 26. Indeed, it does so at multiple points. *See* Rule at 23810, 23849, 23857.

Moreover, the Secretary "decline[d]" to use her discretionary authority. Rule at 23818. That declination is "committed to agency discretion by law" and therefore not reviewable under the APA, 5 U.S.C. § 701(a)(2). Whether a higher loan amount "is warranted in order to carry out" the purposes of the HEA, 20 U.S.C. § 1078-8(d)(2)(A), depends on "a complicated balancing of a number of factors which are peculiarly within the Secretary's expertise." *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 318 (4th Cir. 2008) (citation omitted). And section 428H "is drawn so that a court would have no meaningful standard against which to judge the [Secretary's] exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citation omitted). That provision allows higher loan limits to offset "exceptionally high costs" of certain education, but never defines "exceptionally high." 20 U.S.C. § 1078-8(d)(2)(A). Such a "fuzzy" phrase obviously invites discretion, *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 294 (4th Cir. 2022), as does requiring the Secretary to make a "determin[ation]" before authorizing higher loan limits, 20 U.S.C. § 1078-8(d)(2)(A).

## III. The Department's Implementation of the Interim Exception is Lawful.

Plaintiffs and the Department appear to disagree on both (1) the conditions a borrower must satisfy to qualify for the interim exception, and (2) the operation of that exception once a borrower has qualified. *See* Pls.' MSJ at 27–29. Both questions are resolved by a plain-text reading of § 1087e(a)(8). The Rule gives effect to that reading by treating continued enrollment in the qualifying program as necessary to continued application of the interim exception.

The Court need not go beyond the plain language of the statute to see that § 1087e(a)(8) creates a time-limited exception, which applies to a borrower's current enrollment as of June 30, 2026. *See Lynch v. Jackson*, 853 F.3d 116, 121 (4th Cir. 2017) ("[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (citation omitted)). The Department properly implemented the program-specific interim exception based on this plain reading of the statutory text, and the results in the Rule that followed are lawful.

In construing a statute, the Court must read its language in "context and with a view to [its] place in the overall statutory scheme." *Id.* (citation omitted). Congress did two things in 20 U.S.C.

§ 1087e(a)(8)(A). It established a date—June 30, 2026—on which an individual must satisfy the two stated conditions to qualify for the interim exception, and it specified that the interim exception operates "during" a defined period thereafter—the "expected time to credential." 20 U.S.C. § 1087e(a)(8)(A). Congress then repeatedly tied the duration of the "expected time to credential" to the individual's particular "program of study" from subsection (A) in which the borrower "is enrolled." *Id.* § 1087e(a)(8)(B). These provisions must be read together.

Plaintiffs' qualification discussion focuses on the first requirement that the borrower "is enrolled in a program of study at an institution of higher education" as of June 30, 2026. Pls.' MSJ at 27–28 (citation omitted); *see* 20 U.S.C. § 1087e(a)(8)(A)(i). But § 1087e(a)(8)(A) contains a second eligibility requirement that the borrower "has received a loan (or on whose behalf a loan was made) under this part for such program of study." 20 U.S.C. § 1087e(a)(8)(A)(ii). Congress, thus, did not describe the qualifying circumstances solely in terms of a borrower's enrollment status on June 30, 2026. *But see* Pls.' MSJ at 27–28. It linked the borrower's eligibility for the interim exception to the particular "program of study" in which the borrower "is enrolled," and for which the borrower "has received" a qualifying loan. 20 U.S.C. § 1087e(a)(8)(A). The Department's Rule accordingly identifies and applies these two requirements for a borrower to qualify for the interim exception. *See, e.g.*, Rule at 23812 ("Consistent with Section 455(a)(8) of the HEA, the only requirements to meet the interim exception are that the student is enrolled in a program of study at an institution as of June 30, 2026; and a Direct Loan was made for such program of study prior to July 1, 2026.").

The program-specific language that permeates the statute provides the starting point for understanding the second question—how the interim exception operates after a borrower qualifies. Section 1087e(a)(8)(A) provides that the otherwise-applicable new loan limits "shall not apply" during the borrower's "expected time to credential described in subparagraph (B)." 20 U.S.C. § 1087e(a)(8)(A). Congress then repeatedly tied the definition of the "expected time to credential" to the individual's enrollment in the particular "program of study" from subparagraph (A). *Id.* § 1087e(a)(8)(B). Subparagraph (B) determines the borrower's "expected time to credential"

based on "the program of study in which the individual is enrolled" and "the period of such program of study that such individual has completed" as of June 30, 2026. *Id.* § 1087e(a)(8)(B)(ii). Subsection (B) further provides that the expected time to credential is the lesser of three academic years or the difference between "the program length" and "the period of such program that an individual has completed as of [June 30, 2026]." *Id.* Thus, where the program-specific calculation yields more than three years, the statutory three-year ceiling controls. *See id*. § 1087e(a)(8)(B). But where the program-specific calculation yields less than three years, the borrower's expected time to credential is the shorter period. *See id*.

Whether the three-year ceiling applies, or a shorter period controls, necessarily depends on the specific "program of study in which the individual is enrolled" and the portion of "such program" the borrower "has completed" as of June 30, 2026.[9] 20 U.S.C. § 1087e(a)(8)(B). Congress's use of the present-tense predicate "is enrolled" and references to "such program of study" that the individual "has completed" tie the expected time to credential calculation to the "program of study" identified in subparagraph (A). *Id.* Congress therefore did not describe the applicable timeframe of the interim exception as a free-floating period attached to the borrower. *But see* Pls.' MSJ at 27–28. Rather, Congress defined the applicability of the interim exception as necessarily tied to the borrower's enrollment in, loan status for, and progress through the particular program of study at an institution identified in subparagraph (A).

The Department gave lawful effect to this statutory construction by clarifying through the Rule that the interim exception ceases to apply when a borrower withdraws or otherwise ends enrollment in the qualifying program of study: the event severs the relationship to the program that § 1087e(a)(8)(B) uses to define the applicable period of the exception. *See* Rule at 23883. This

---

[9] For example, a borrower enrolled in a six-year program who has completed two years as of June 30, 2026, would have four years remaining under the calculation in subsection (B)(ii), but the statute limits the expected time to credential to three academic years. *See* 20 U.S.C. § 1087e(a)(8)(B). By contrast, a borrower enrolled in a four-year program who has completed three years would have only one year remaining under section (B)(ii), and the expected time to credential (and the applicable period for the interim exception) would therefore be only one year. *See id.*

reading does not add a third condition for qualifying for the exception. *See, e.g.*, *id*. at 23812 (recognizing only two eligibility "requirements to meet the interim exception"). *But see* Pls.' MSJ at 27–28. Rather, it specifies how the interim exception operates after it has attached, giving full effect to the statute's program-specific provisions governing the borrower's "expected time to credential." *See supra* § III.A.1–2.

The Department's Rule applies the best reading of the statutory text. It preserves the two conditions for qualification while giving independent effect to Congress's program-specific definition of the expected time to credential, *see* § 1087e(a)(8)(B), and consequently, the period during which the exception applies, *see* § 1087e(a)(8)(A). Plaintiffs' reading, by contrast, gives the June 30 enrollment determination dispositive effect without explaining how the program-specific provisions in subparagraph (B) operate when the borrower is no longer enrolled in the program on which the statutory duration calculation was based.

Plaintiffs do not explain how their reading is consistent with the text of the statute, and their desired interpretation leaves unclear how the required expected time to credential calculation is made if a borrower leaves the qualifying program, enters a different program, or later returns to school after an extended absence. And insofar as Plaintiffs contend that the statute creates a benefit that follows the borrower wherever they go for the duration of the program they were enrolled in as of June 30, that interpretation is contrary to the interim exception's ostensible purpose and produces absurd results. Consider a borrower who qualifies for the exception on June 30 but withdraws from the qualifying program after one year and returns five years later. Plaintiffs' interpretation provides no textual basis for whether the borrower's remaining eligibility expired during the intervening period, was tolled until the borrower reenrolled, or carries forward to the new enrollment even if the borrower seeks a different degree. Plaintiffs' reading also gives no weight to Congress's connection of the qualifying program of study to "an institution of higher education." 20 U.S.C. § 1087e(a)(8)(A)(i). The indefinite article "an" identifies a single institution in which the borrower is pursuing the qualifying program of study. Read together with the rest of the interim exception statute, these provisions tie the exception to the particular program

of study in which the borrower is enrolled on June 30 rather than creating a borrower-wide benefit that follows the borrower to any institution or subsequent program.[10] Plaintiffs' interpretation ultimately fails to provide an administrable rule supported by the text.

The Department's treatment of "students who withdraw and re-enroll," "transfer students who continue the same program of study at a different institution" or students who "seek to earn a bachelor's degree rather than an associate's degree at the same institution," Pls.' MSJ at 27–28, is consistent with the plain reading of the statute. As the Department explained, "a student may receive the legacy loan limits during the period of the student's expected time to credential" but "[s]tudents who enroll in a new program of study on or after July 1, 2026, . . . are subject to the new loan limits." Rule at 23812. And Plaintiffs are simply wrong that the Rule's treatment of transfer students conflicts with other Department regulations and past practices. *See* Pls.' MSJ at 28 (citing 34 C.F.R. § 685.214(d)(1)(i)(B) governing loan discharges when a student is forced to end enrollment because the school closed); *see also* 34 C.F.R. § 668.22 (existing regulations governing entitlement to title IV funds based on a student's enrollment status, distinguishing a withdrawal from an approved leave of absence); Rule at 23815 (explaining "[w]hen a borrower is granted a leave of absence, they are not considered to be withdrawn [under § 668.22] so they are still eligible for the interim exception").

Section 1087e(a)(8) creates a time-limited exception, which applies to a borrower's current enrollment as of June 30, 2026. The Rule properly gives effect to that statutory structure by treating continued enrollment in the qualifying program as necessary to continued application of the interim exception.

## IV. The Department's Implementation of the Interim Exception is Not Arbitrary and Capricious.

The Rule's treatment of students who transfer, or otherwise withdraw, is not arbitrary and capricious because the Department applied the best reading of the statute. Adherence to statutory

[10] Subparagraph (C)'s program-specific measure further reinforces this point because Congress defined "program length" with reference to a "specific program of study," not an abstract reference to a field of academic study. 20 U.S.C. § 1087e(a)(8)(C).

text is not arbitrary and capricious. The D.C. Circuit recently held as much in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026). There, the court rejected a challenge to the Internal Revenue Service's disclosure of the addresses of some taxpayers to immigration officials under a provision of the Tax Reform Act. *See id.* at 1227. The court first held that the Tax Reform Act authorized the agency to disclose the addresses. *See id.* at 1230–31. The court determined that a plain reading of the "statutory text alone is enough to resolve this case" and declined appellants' urging "to depart from the text of the statute." *Id.* at 1231 (quoting *Pereira v. Sessions*, 585 U.S. 198, 209 (2018)). The court also found that appellants could not succeed on their arbitrary-and-capricious claim because, as relevant here, "[o]nce the court determines the meaning of [the statute] there is no reason to seek an agency's explanation." *Id.* at 1237. Although this case involved a change in agency position, which is not at issue here, the court explained that in a post-*Loper Bright* world "where there is no suggestion that the contested statutory provision 'delegates discretionary authority' to the agency," the question is not whether an agency adequately explained itself but solely what constitutes "the best reading of a statute." *Id.* at 1237–38 (quoting *Loper Bright*, 603 U.S. at 395).

Here, the Rule represents the Department's lawful adherence to the plain text of the interim exception, which the Department explained it did not have the authority to alter in the way that commenters, and Plaintiffs here, desire. Rule at 23812 ("Since [the definition of the expected time to credential] is statutory, this definition is not flexible."); *id.* ("Congress did not authorize the Department to amend these interim exceptions in the ways the commenters recommend."). The Department also was not required to consider reliance interests because it was interpreting a new statute for the first time, not changing course on a policy position. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020) ("[B]ecause DHS was 'not writing on a blank slate,' it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." (emphasis and citation omitted)); *see also* Rule at 23813 (responding to comments raising reliance interests by explaining "the statutory changes to the HEA require us to impose these loan limits. Congress used

its authority to eliminate the Grad PLUS program and change various loan limits in the [WFTCA], so the Department must implement this change"). The Department thus need not supply the same sort of detailed explanation for its action mandated by statute as it would for a policy decision. Indeed, the purpose of the interim exception was to account for already-enrolled students' reliance interests; the Department was not free to account for those interests differently than Congress.

Plaintiffs contend that the Department's treatment of borrowers who transfer or withdraw and later reenroll is inconsistent with its treatment of borrowers who change programs at the same institution. *See* Pls.' MSJ at 29. But the Department explained how "admittance is significantly different for graduate and professional students than it is for undergraduates," including that graduate students "cannot generally switch to a different degree program without submitting a new application for admittance." Rule at 23814; *see also* NPRM at 4270.[11] By contrast, undergraduate "[s]tudents are generally not admitted to undergraduate institutions in a manner that binds them to a specific major; they can switch majors without generally seeking new admittance to the institution." NPRM at 4270. The Department accordingly explained that an undergraduate student "who changes majors within the same degree or certificate program remains enrolled in the same program of study," while graduate or professional students who "switch graduate programs" "are switching programs of study," even at "the same institution." *Id.* However, because graduate or professional students can similarly shift concentrations "within the same 4-digit CIP code" without withdrawing or reapplying, the Department determined that these students "do not change programs of study" for purposes of the interim exception so long as "they remain in the same 4-digit CIP code at [the same] credential level and institution." Rule at 23814. By contrast, a student who unenrolls from a program of study at an institution and later reenrolls in the same program at the same institution or a different institution, must "submit[] a new application for admittance." *Id.* Students transferring institutions, thus, enter a new program of study and do not remain

[11] This case discusses undergraduate degrees because students whose parents received a Parent PLUS loan disbursement prior to July 1, 2026, may be eligible for the interim exception. 20 U.S.C. § 1087e(a); *see also* 34 C.F.R. § 685.203(g)(4).

enrolled in the qualifying program to maintain the interim exception. *See id.*; *see also* NPRM at 4275 ("[T]he exception is only available to borrowers who remain enrolled in a program of study as required by Section 81001 . . . . If a borrower withdraws, the borrower is no longer enrolled.").

The Department treated undergraduate students the same way. "[S]tudents who are enrolled in an associate's degree program and transfer into a bachelor's degree program are unlike undergraduate students who transfer majors," because they must generally seek new admittance to a new degree program and "are not considered the same program." Rule at 23821; *see* NPRM at 4270. The Department further supported this point by referencing 20 U.S.C. § 1001(a)(3), where Congress separately listed three distinct ways an institution can qualify as a "higher education institution." Rule at 23821–22. The Department explained how this section provides additional support for treating these students as enrolling in a new program of study. *See id.* at 23822.

The consistency of the Department's approach is further highlighted by the Department's treatment of dual-degree programs. Students who are enrolled in a single dual-degree program continue to remain enrolled in the program of study for which they received the qualifying loan and for which the interim exception duration is calculated. They thus remain entitled to the interim exception. *See* Rule at 23815. The Department's application of the statute is also consistent with the Department's existing regulatory framework governing entitlement to title IV funds based on a student's enrollment. *See* 34 C.F.R. § 668.22 (distinguishing between withdrawal and approved leaves of absence); Rule at 23815 (explaining "[w]hen a borrower is granted a leave of absence, they are not considered to be withdrawn, so they are still eligible for the interim exception"). Defendants also responded to the comments Plaintiffs cite, *see* Pls.' MSJ at 31, which express concerns believing the Department "addressed too many complex issues at once" and questioning the "timeline to make the system and operational changes." Rule at 23773 (responding to such general comments). Plaintiffs identify no specific comment that the Department left unaddressed.

Even if the Court finds that the Department could have articulated its reasoning more clearly, the Department's "path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

The Department directly addressed withdrawals and transfers in the NPRM and Rule and explained that ceasing enrollment in the qualifying program ends the exception, *see, e.g.*, Rule at 23813 ("A borrower who officially withdraws or otherwise ceases to be enrolled would lose continued eligibility under the interim exception."), demonstrating that the Department understood the exception to operate only with respect to the qualifying program during the expected time to credential. The Department then explained how the interim exception applies to different borrowers and consistently applied the same standard.

**V. Any Relief Should Be Appropriately Limited.**

**A. Plaintiffs Are Not Entitled To a Permanent Injunction**

No relief is warranted here for all the reasons above. But if the Court disagrees, it should not enter Plaintiffs' requested injunction, which "require[s] [degrees in eight fields] to be treated as professional degrees." Pls.' MSJ at 17.

**1.** Plaintiffs have not met the factors for permanent injunction relief. They must show "actual success on the merits" and then must show (1) irreparable injury; (2) that legal (as opposed to equitable) remedies are inadequate to compensate that injury; (3) that "an injunction is warranted after considering the balance of hardships between the parties," and (4) that the public interest would not be disserved by a permanent injunction. *ClearOne Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 39, 46 (D. Md. 2024) (citation omitted). The last two merge when the Government is the defendant. *See Kravitz v. U.S. Dep't of Com.*, 366 F. Supp. 3d 681, 755 (D. Md. 2019).

Plaintiffs have not shown success on the merits for the reasons above. They also have not shown irreparable harm. All Plaintiffs' asserted injuries are entirely speculative, whether because they depend on the actions of third parties or are predictions without any reasonable basis that an injury is impending. *See supra* § I; *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) ("[I]rreparable harm must be neither remote nor speculative.").

Regarding the final two factors for permanent injunctive relief, they do not favor an injunction. The Rule is consistent with the motivation behind the relevant sections of WFTCA,

which is "to lower the cost of post-secondary education for taxpayers, students, and families." H.R. Rep. No. 119-206, at 203 (2025) (Book 1). "[P]ublished tuition and fees" for postsecondary education rose by "164 percent, nearly three times faster than the rate of inflation," in the two decades before 2020. *Id.* at 207. As a result, the share of Americans' expenditures towards higher education "nearly doubl[ed]" in those 20 years. *Id.* Easing this burden on families and students is in the public interest, and setting loan limits is one step to reduce borrowers' overall expenditures and "provide an incentive to institutions to limit tuition increases." NPRM at 4299. On that point, Plaintiffs' proposed injunction would force the Department to make higher payments for degrees that have not yet been conclusively determined to meet the statutory definition of professional degree. That injunction would infringe on Congress's "broad discretion" to determine how and under what conditions federal taxpayer dollars are spent. *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such an intrusion into the workings of a coordinate branch of the Government inflicts irreparable harm on the Government.

**2.** Even if Plaintiffs could meet the required showing for permanent injunctive relief, the requested injunction is improper in this case. "Fourth Circuit law recognize[s] vacatur as the final remedy in APA cases." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 121 (D. Md. 2025) (denying requests for "further declaratory and injunctive relief" beyond vacatur). And once portions of a rule are vacated, those portions are "void, null, and nonexistent" at least as to Plaintiffs. *Id.* at 122. Assuming vacatur is an available remedy under the APA, vacatur forecloses any need for an injunction.

Those principles are especially important here because any vacatur of the professional degree provisions of the Rule "does not change the validity or force of the statutory definition" enacted by Congress. *AANP*, 836 F. Supp. 3d at 210. Agencies are "entitled to construe [their] own regulations in the first instance," *Noble Energy, Inc. v. Salazar*, 671 F.3d 1241, 1246 (D.C. Cir. 2012) (citation omitted), and this Court cannot "assume the mantle of the regulatory agency" to determine that degrees are professional under the statutory definition, *AANP*, 836 F. Supp. 3d at 212. Whether a degree meets that definition is a question "best reserved for the agency to

consider in the first instance," as the D.C. court held when rejecting an analogous request as to physician-assistant degrees. *Id.* The Department "has already expended considerable effort" to implement the new loan caps, "has expert knowledge about the many graduate degree programs" and "institutional knowledge about the meaning and application of" § 668.2 that it should be permitted to apply to those eight fields if the Court sets aside any portion of the Rule. *Id.* Issuing the requested injunction would improperly short-circuit that process.[12]

**B. Plaintiffs Should Not Receive Declaratory Relief**

For many of the same reasons, Plaintiffs should not receive the declaratory relief they have requested. *See* Proposed Order ¶ 4. Parts a and c seek declarations that the definition of professional degree and the grandfathering provisions are unlawful. *See id.* Those requests are duplicative of the vacaturs sought as to those provisions and can be dismissed on that basis alone. *See Chevron U.S.A. Inc. v. Apex Oil Co., Inc.*, 113 F. Supp. 3d 807, 824 (D. Md. 2015) ("When declaratory relief would be duplicative of claims already alleged, dismissal is warranted." (citation omitted)). There would be "no[] need to independently enter a declaratory judgment" against an already vacated Rule provision. *Am. Fed'n of Teachers*, 796 F. Supp. 3d at 122. The other requested declarations also should not be granted. The Department has already described how a declaration related to Section 428H discretion is unwarranted. *See supra* § II.B.2.; Proposed Order ¶ 4.b. And if the Court disagrees, the proper remedy is to remand for the Secretary to consider in the first instance what programs qualify for higher loan limits, not to direct the Secretary how to exercise her discretion under Section 428H. Plaintiffs also cannot receive a declaration that the Department's treatment of the eight degrees is contrary to law because the Department must be permitted to review those degrees afresh under the statute. *See supra* § II.A.; Proposed Order ¶ 4.d.

---

[12] If the Court does enter the requested injunction, it must be limited to enforcement of the definition in "Plaintiff States," as Plaintiffs request. Proposed Order ¶ 3; *see Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

### C. Any Relief Should Be Limited to the Plaintiffs With Standing and the Relevant Portions of the Rule.

Any relief should be limited to Plaintiffs with standing. As the Supreme Court explained in *CASA*, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *CASA*, 606 U.S. at 852. And once a party has received complete relief, providing relief to nonparties "would not render [the party's] relief any more complete." *Id.* at 853; *see also Gill v. Whitford*, 585 U.S. 48, 73 (2018) (Any remedy must "be tailored to redress the plaintiff's particular injury."). The same reasoning applies to any vacatur remedy. *See, e.g.*, *Texas*, 599 U.S. at 693–703 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment). Here, these principles require that no relief should redound to the benefit of private institutions within Plaintiff States. *Contra* Pls.' MSJ at 34 n.7. Those institutions are not administered by Plaintiffs and can sue in their own right. That they have not sued means they are not "plaintiffs before the court" entitled to relief. *CASA*, 606 U.S. at 852 (emphasis omitted). Any relief also should be limited to the portions of the Rule, if any, that the Court determines are unlawful. Those portions are the two provisions that Plaintiffs ask be vacated. *See* Proposed Order ¶¶ 1–2.

## CONCLUSION

For the forgoing reasons, the Court should grant Defendants' motion to dismiss and dismiss this case in its entirety for lack of subject matter jurisdiction. In the alternative, Defendants request that the Court enter summary judgment in favor of Defendants.

Dated: September 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE BENNETT
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Christian Dibblee*
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
KATHRYN L. ALKIRE (FL Bar No. 1050146)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*